UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

BUSINESS WATCHDOG, MERGENT       :
SERVICES, and JOHN ANDRIES BAL, JR.,             13 CV 6794 (CM)

           Plaintiffs,         :

                    :       **VERIFIED**

        -v-         :       **FIRST**

                    :       **AMENDED**

ITEX CORPORATION, STEVEN WHITE,         **COMPLAINT**
personally and in the capacity of CEO, CFO,
and Chairman of the Board, ERIC BEST,     :
personally and in the capacity of Director,
JOHN WADE, personally and in the capacity
of Director, ROBERT BENSON, personally    :
and in the capacity of Vice President, NYTO
TRADE INCORPORATED, JOHN CASTORO
aka NYTO TRADE INCORPORATION aka    :
NYTO TRADING CORPORATION aka NYTO
TRADE EXCHANGE and 44 TRADE       :
CORPORATION, aka NYTO TRADE, INC.,    Jury Trial Demanded
personally and in the capacity of President,
and IZZY GARCIA, personally and in the    :
capacity of Manager,

                    :

          Defendants.

------------------------------------------------------------------x

## Complaint

1.    Plaintiff John Bal ("plaintiff," "his," or "he") is a current shareholder and,

during relevant periods, a member of Itex Corporation ("Itex"). He is the

owner of Mergent Services, a sole proprietorship and the founder of

Business Watchdog (a consumer advocacy organization). He is also acting

in the capacity of a private attorney general[1].

_____

[1] Private attorney general is an equitable doctrine that allows a private citizen to bring a

1

2.     Plaintiff complains and alleges upon information and belief against

defendants Itex, Steven White ("White") personally and in the capacity of

CEO and Chairman of the Board of Itex, Eric Best ("Best") personally and in

the capacity of Director of Itex, John Wade ("Wade") personally and in the

capacity of Director of Itex, Robert Benson ("Benson") personally and in the

capacity of Vice President of Itex, NYTO Trade Incorporated ("NYTO"),

John Castoro ("Castoro") aka NYTO Trade Incorporation aka NYTO

Trading Corporation aka NYTO Trade Exchange aka 44 Trade Corporation

aka NYTO Trade, Inc. (collectively "Castoro's phantom corporations)

personally and in the capacity of President and CEO of NYTO, and Izzy

Garcia ("Garcia"), personally and in the capacity of Manager of NYTO and

Castoro's phantom corporations (collectively, the "defendants"), as follows:

### Introduction

3.     Plaintiff Bal brings this action: (a) for breach of contract, (b) for violations

of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (c)

derivatively on behalf of Itex, (d) for violations of his constitutional rights,

and (e) for equitable relief.

---

lawsuit in the public's interest. The private attorney general doctrine first appeared in the decision of the Honorable Jerome Frank of the 2nd Circuit U.S. Court of Appeals (*Assoc. Indus. of New York* v. *Ickes*, 134 F.2d 694, 704 (2d Cir. 1943). More recently, in *Holmes v. SIPC*, 503 U.S. 283 (1992), a RICO case, Justice O'Connor pointed to Congress' purpose of bringing "the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources" are inadequate.

## Jurisdiction

4.     This court has subject matter jurisdiction over this action pursuant to 28

USC § 1331 (Federal question), 28 USC §1332 (Diversity of citizenship;

amount in controversy; costs), 28 USC § 1343 (Civil rights and elective

franchise), 28 USC 1443 (Civil rights cases), 42 USC 1983 (Civil action for

deprivation of rights), 42 USC § 1985(3) (Conspiracy to interfere with civil

rights),  42 USC § 1986 (Action for neglect to prevent), 18 USC § 1964(c)

(Civil remedies), New York Civil Rights – Article 2 - § 10 (Justice to be

administered without favor and speedily), New York Tax Law § 1101

(Definitions), New York Tax Law §§ 1801- 1807 (Tax fraud acts), New York

Tax Law - Part 2 - § 1809 (Corporate taxes; repeated failure to file), New

York Tax Law - Article 9 - § 203(a) (Dissolution of delinquent business

corporations), and New York Civil Practice Law and Rules 205(a), 18 USC

§ 1084 (Transmission of wagering information),  18 USC § 1341 (Frauds

and swindles),  18 USC § 1343 (Fraud by wire, radio, or television), 18 USC

§ 1952 (Interstate and foreign travel or transportation in aid of racketeering

enterprises), 18 USC § 1953 (Interstate transportation of wagering

paraphernalia),   18 USC § 1955 (Prohibition of illegal gambling

businesses),  18 USC § 1956 (Laundering of monetary instruments),  18

USC § 1957 (Engaging in monetary transactions in property derived from

specified unlawful activity),  18 USC § 1960 (Prohibition of unlicensed

money transmitting businesses),  18 USC § 2315 (Sale or receipt of stolen

goods, securities, moneys, or fraudulent State tax stamps).

## Venue

5.    Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and
      28 U.S.C. § 1391.

## Parties

6.    Plaintiff is a sole proprietorship doing business as Mergent Services, a
      shareholder of Itex, and, during relevant periods, a member of Itex.  His
      principal place of business is 85 Kenmare Street, Apartment 35, New York,
      NY 10012.

7.    Defendant Itex is a Nevada corporation.  Its principal place of business is
      3326 160th Ave SE, Suite 100, Bellevue, Washington 98008.  Itex is an
      *unlicensed* and *unbonded* online financial institution with 90+ offices that
      annually processes $200 million of transactions made by its 23,500
      members throughout the United States and Canada.

      Itex processes the transactions of its members using, interchangeably,
      United States dollars and Itex-issued dollars.  The Internal Revenue Service
      ("IRS") officially determined that United States dollars and Itex-issued
      dollars are equal.  Herein, United States dollars and Itex-issued dollars are
      both referred to as funds.

      Itex, to date, is an *unauthorized foreign corporation* illegally doing
      business in forty-seven (47) states that is concealing millions of dollars of
      income from those states.

8.    Defendant White is Itex's Chief Executive Officer ("CEO"), Chairman of
      the Board of Directors ("Chairman"), and, during the relevant period, Chief

Financial Officer ("CFO"). White's principal place of business is 3326 160th Ave SE, Suite 100, Bellevue, WA 98008-3418.

9.    Defendants Best and Wade are Directors of Itex. Best's and Wade's principal place of business is 3326 160th Ave SE, Suite 100, Bellevue, WA 98008-3418.

10.    Defendant Benson is a Vice President of Itex. Benson's principal place of business is 3326 160th Ave SE, Suite 100, Bellevue, WA 98008-3418.

11.    Defendant NYTO, a Delaware corporation, is an Itex broker/franchisee. NYTO's principal place of business is 1103 Westfield Avenue, Rahway, NJ 07065.

NYTO, to date, is an *unauthorized foreign corporation* illegally doing business in New York State ("NYS") and concealing millions of dollars of income from NYS. NYTO, from 2003 to 2006, was an *unauthorized foreign corporation* illegally doing business in New Jersey ("NJ") and concealed millions of dollars of its income from NJ.

12.    Defendant Castoro is the President and CEO of NYTO. His principle place of business is 1103 Westfield Avenue, Rahway, NJ 07065. From 2000 to 2003, Castoro conducted business in NYS and NJ using Castoro's phantom corporations. Castoro's phantom corporations were neither registered as corporations nor as Castoro's business names.

13.    Defendant Garcia is the Manager of NYTO and, during relevant periods, Manager of Castoro's phantom corporations. Garcia's principal place of business is 1103 Westfield Avenue, Rahway, NJ 07065.

**The New York State Supreme Court action**

14.    On May 25, 2007, plaintiff filed breach of contract and conversion action in the New York State Supreme Court – New York County (Index No. 601777/2007) (the "Supreme Court action") against Itex, NYTO, Castoro, Garcia, et al.

15.    Itex, NYTO, and their attorneys failed a duty to notify the Supreme Court action that Itex and NYTO are *unauthorized NYS foreign corporations.*

16.    Despite the passage of nearly seven (7) years, seven (7) of the eight (8) defendants in the Supreme Court action never answered the complaint against them.

17.    On March 26, 2013, the Supreme Court action dismissed the complaint against all the defendants.  The dismissal was not based upon a final judgment of the merits of the complaint.

18.    On September 24, 2013, plaintiff filed the instant action which is presently before the District Court upon the same transactions and occurrences as the Supreme Court action.

19.    Plaintiff's "WHEREFORE" clause in the Supreme Court action stated that his "damages are continuing and accumulative."

**Count I**

**Conversions, Breaches of Fiduciary and Contractual Duties,
Breaches of the Implied Covenant of Good Faith and Fair Dealing,
and Tortuous Interference with Plaintiff's Business Relationships**

**(against Itex, White, Benson, NYTO, Castoro,
Castoro's phantom corporations, and Garcia)**

20.   Plaintiff repeats and re-alleges the allegations contained in each of the preceding and succeeding paragraphs as if fully set forth in this Count.

21.   The U.S. Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") requires Itex to conduct business on par with banks and financial institutions.

22.   Itex, White, Benson, NYTO, Castoro, Castoro's phantom corporations, and Garcia ("defendants") breached fiduciary and contractual duties, breached the implied covenant of good faith and fair dealing, and tortuously interfered with plaintiff's business relationships.  The defendants violated their fiduciary duty by *acting in furtherance of their personal interests and benefits.*

23.   For a fee, Itex was required to safeguard the funds in plaintiff's account, record plaintiff's financial transactions, provide business advice to plaintiff, and annually report plaintiff's sales to the IRS on form 1099B.  Itex also accessed the private information in plaintiff's account at will.

24.   The contracts and transactions at issue were executed in NYS.

25.   Itex, NYTO, and Castoro's phantom corporations are *unauthorized* foreign corporations illegally doing business in NYS.

26.   The New York State Department of State ("DOS") annulled Itex's authority as a foreign corporation to do business in NYS on June 26, 2002 for failing to file the required tax returns and not paying the applicable taxes.

27. Despite the DOS annulment, to date, Itex boldly continues to do a robust business in NYS without filing the required NYS tax returns, paying the applicable taxes, and concealing millions of dollars of its NYS income.

28. NYTO, Castoro, and Castoro's phantom corporations never received the authority from the DOS to do business in NYS. Despite not having the authority to do business in NYS, to date, NYTO, Castoro, and Castoro's phantom corporations boldly do a robust business in NYS without filing the required tax returns, paying the applicable taxes, and concealing millions of dollars of its NYS income.

**Conversions, breaches of contracts, and breaches of the implied covenant of good faith and fair dealing**

29. On December 26, 2002, Itex sold plaintiff $24,000 of advertising under the pretext of selling him advertising in the New York Daily News ("Daily News"). Garcia, who brokered the transaction, stated this advertising could be used by plaintiff in the future as needed. Plaintiff paid for this advertising with an Itex check payable to the Daily News in the amount of $24,000. Itex withdrew $24,000 (plus a $720 commission) from plaintiff's account.

On or about April 7, 2007, the Daily News refused to provide plaintiff with advertising. The Daily News stated it neither authorized a sale of advertising to the plaintiff nor received plaintiff's Itex check for $24,000. As a result, Itex sold bogus advertising to the plaintiff. Subsequently, Itex, White, Castoro, Castoro's phantom corporations, and Garcia refused to return plaintiff's $24,720.

8

Itex, White, Benson, Castoro, Castoro's phantom corporations, and Garcia schemed to conspire, aid, and abet the conversion of plaintiff's $24,720. In furtherance of this scheme, defendant Benson submitted an affidavit in the Supreme Court action that fraudulently stated plaintiff's $24,000 was transferred to the Daily News on December 26, 2002. The Daily News provided affidavits from its executives stating the Daily News did not receive plaintiff's $24,000 from Itex.

30.    On June 4, 2007, Castoro telephoned plaintiff and angrily threatened that if plaintiff did not withdraw the Supreme Court action Castoro would, "Sue [plaintiff] for millions of dollars and put [plaintiff] out of business by seizing and freezing [plaintiff's eBuy-Sell's] account." Plaintiff is the sole owner of eBuy-Sell.com, Inc. ("eBuy-Sell"). Plaintiff declined to withdraw the Supreme Court lawsuit.

This was extortion. If plaintiff did not withdraw the Supreme Court action, Itex would freeze plaintiff's eBuy-Sell's account (this is the modern day equivalent of burning down plaintiff's business).

In addition, Castoro's threat was an attempt to deprive plaintiff of his constitutional right to sue. The right to sue is one of the highest and most essential privileges of citizenship.

Castoro executed his threat. Itex froze plaintiff's eBuy-Sell account. On June 6, 2007, in an email, Castoro advised that plaintiff's eBuy-Sell account was "frozen do [sic] to pending litigation." This abruptly put eBuy-Sell and

plaintiff out of business. This tortuously interfered with plaintiff's business relationship with eBuy-Sell. The resultant harm was foreseeable.

31.　On November 21, 2003, Itex sold plaintiff $25,000 of advertising. Although Cindy Aikens, Trade Director for Itex, initially contacted the plaintiff it was Garcia that brokered a separate transaction for plaintiff's purchase of $25,000 of advertising. Garcia stated plaintiff could use this advertising in the future as needed. Itex withdrew $25,000 (plus a $750 commission) from plaintiff's account.

On or about April 7, 2007, Itex breached the contract by refusing to provide advertising. Subsequently, Itex, White, NYTO, Castoro, and Garcia refused to return plaintiff's $25,750. Itex, White, NYTO, Castoro, and Garcia schemed to conspire, aid, and abet the conversion of plaintiff's $25,750.

32.　On December 13, 2004, Itex sold eBuy-Sell $6,000 of advertising. The transaction was brokered by Garcia. Garcia stated eBuy-Sell could use this advertising in the future as needed. Itex withdrew $6,000 (plus a $180 commission) from eBuy-Sell's account. On or about April 7, 2007, Itex breached the contract by refusing to provide advertising. Subsequently, Itex, White, NYTO, Castoro, and Garcia refused to return eBuy-Sell's $6,180. Itex, White, NYTO, Castoro, and Garcia schemed to conspire, aid, and abet the conversion of eBuy-Sell's $6,180.

33.  The conversions and breaches of contracts on December 26, 2002, November 21, 2003, and December 13, 2004 caused lost profits to the plaintiff in the amount of $580,000.

34.  During the period of plaintiff's Itex membership and to this day, Itex is an unauthorized foreign corporation illegally conducting business in NYS. From April 18, 2002 to May 7, 2011, Itex collected $3,510 in association payments from plaintiff ($30 every four weeks X 117 weeks).  Plaintiff demands the return of the $3,510.

35.  Plaintiff demands the return of $1,590 ($30 every four weeks X 53 weeks) collected by Itex in association fees for the period June 6, 2007 to May 7, 2011.

36.  About April 2007, Itex sold eBuy-Sell $700 of Onyx Restaurant gift certificates.  Itex withdrew $700 (plus a $21 commission) from eBuy-Sell's account.  The gift certificates were unusable.  On May 26, 2007, eBuy-Sell returned the $700 of unusable gift certificates to Itex.  Itex refused to refund eBuy-Sell's $721.  Accordingly, Itex converted eBuy-Sell's $721.

37.  On June 6, 2007, Itex froze eBuy-Sell's account. To date, there is a balance of $1,686.58 in that account.  Itex refuses to refund the $1,686.58. Accordingly, Itex converted the $1,686.58.

38.  Itex no longer requires members to sign an agreement with them and has chosen to put the Member Agreement ("Agreement") and Marketplace Rules ("Rules") on their website.  Virtually all transactions are conducted without going to the Agreement and Rules pages of Itex's website.  In

addition, members are not notified of changes to the Agreement or Rules. As a result, members are not aware of the Agreement's and Rules' content.

As a good business practice, Itex should provide a copy of the Agreement and Rules, and changes when they occur, to members with a method that acknowledges members, receipt.

39.     In breaches of the implied covenant of good faith and fair dealing, Itex's Agreement and Rules have gaping "loop holds" that are abused and used to embezzle funds from members' account, permit access to members' private account information without consent, allow unauthorized withdrawals from members' account, permit members' funds to be comingled with Itex's and Itex brokers'/franchisees' accounts, and allow Itex, its brokers/franchisees, and the staffs of both to give themselves a priority over members and siphon off desirable merchandise before reaching members.

40.     Members entrust Itex with the funds in their Itex account.  When members either voluntarily cancel their Itex membership or are terminated, *Itex improperly withholds and does not release funds belonging to the members.*  As an example, since May 7, 2011, Itex has withheld and refused to release the $1,686.58 balance in eBuy-Sell's account.

41.     Itex's Spend Down Status contained in the Rules is a breach of the implied covenant of good faith and fair dealing

42.     By connecting two Rules, Itex embezzles funds belonging to its members.

Rules at 2.4., <u>Member Eligibility</u>, in relevant part, states:

"We [Itex] reserve the right to approve, deny, suspend, or terminate membership or use of an Account by any business or individual, **in our sole discretion, for any reason or no reason**." (emphasis added)

Rule 5.4., <u>Spend Down Status</u>, in relevant part, states:

"If either party terminates your Account and your Account has a positive ITEX dollar balance (where sales exceed purchases), the Account may be placed in "Spend Down status," after ITEX is paid any Fees then owing **plus the transaction Fee on the positive balance**. Spend Down status shall mean you will have twelve months to spend the positive balance in your Account . . . At the end of the twelve-month period . . . **ITEX, in its sole discretion, may terminate the Account, regardless of any remaining positive ITEX dollar balance** or may opt to assess an annual maintenance fee of $200 . . . until the Account's balance is reduced to zero and the Account is closed. You may forfeit your positive ITEX dollar balance by so instructing ITEX in writing and no further fees will be assessed." (emphasis added)

Accordingly, Itex in its "sole discretion, or for any reason or no reason" can place a member in a Spend Down Status. If, for example, a terminated Itex member with a positive account balance of $100,000 is unwilling or unable to pay the "transaction Fee on the positive account balance [which would be about $7,500]", after a 12-month period Itex can convert the members' $100,000. This is a bold theft of members' funds.

43. Members commonly seeking to cancel their membership because merchandise offered by Itex is overpriced, or because they cannot find desirable merchandise (in part, this is caused by the desirable items being siphoned off by brokers/franchisees and their staffs before reaching members), or because of Itex's oppressive Agreement and Rules. Itex's Spend Down Status (described above) prevents members from canceling their membership.

44. Alternatively, members that stopped transacting business with Itex and do not

cancel their membership because of the Spend Down Status will have their accounts bled by Itex's fees. Dormant accounts are often converted by Itex.

45. March 9, 2014, Len Shapiro stated his inability to cancel his Itex membership without being placed in Itex's Spend Down Status was "bleeding his account."

46. On February 23, 2014, Itex member at email address bsg2424@comcast.net stated "to close my account i would have to spend down my itex $ which i don't want to do."

**White and Benson interfered with the arbitration conducted by the American Arbitration Association**

47. Itex submitted an invalid contract in the Supreme Court action that misled the court into ordering the parties to arbitrate their dispute. Plaintiff in the Supreme Court action and plaintiff the action presently before the court is the same person.

In 2009, plaintiff filed a demand for arbitration against NYTO, Castoro, and Garcia and the American Arbitration Association ("AAA") commenced an arbitration (Case No. 75 148 00320 09 GLO). White and Benson are business associates of NYTO, Castoro, and Garcia.

*Itex, White, and Benson were **not** parties in the arbitration.*

In a blatant attempt to improperly influence the arbitrator, on March 26, 2010, White, who was not a party to the arbitration, boldly sent a letter to the arbitrator with $1,650 and offered an additional $55,000 to influence the outcome of the arbitration in favor of NYTO, Castoro, and Garcia

On April 3, 2010, the arbitrator advised the parties [that White's attempt to influence him] was "inappropriate", requested "ITEX Corporation to cease communication with the arbitrator", and returned the $1,650.

On April 6, 2010, Benson, who was also not a party to the arbitration, made a less than graceful effort to cover up for White's attempt to influence the arbitration. Benson wrote the arbitrator claiming that White's March 26, 2010 letter to the arbitrator, clearly signed by White, and the $1,650 and offer of $55,000 sent by White to the arbitrator was, somehow, from Benson. It's unlikely that Benson tricked anyone into believing White's March 6, 2010 was from Benson.

White's and Benson's interference with the arbitration violated their fiduciary and contractual duty to plaintiff and resulted in NYTO's, Castoro's, and Garcia's withdrawal from the arbitration.

48. WHEREFORE, plaintiff requests this court to enter judgment against the defendants as follows:

      A.    Enjoining Itex, NYTO, Castoro, and Castoro's phantom corporations from conducting business in NYS until proper DOS authority is obtained;

      B.    For an award of $24,720 against Itex, White, Castoro, Castoro's phantom corporations, and Garcia for conversion and breach of contract with interest from December 26, 2002;

      C.    For an award of $100,000 against Benson for conspiring to defraud plaintiff;

D.  For an award of $580,000 in plaintiff's lost profits with
interest from June 6, 2007 and $10,000,000 in punitive
damages against Itex and Castoro for interfering with plaintiff's
business relationships and for maliciously putting eBuy-Sell
and plaintiff I out of business.

E.  For an award of $25,750 against Itex, White, NYTO,
Castoro, and Garcia for conversion and breach of contract with
interest from November 21, 2003;

F.  For an award of $6,180 against Itex, White, NYTO,
Castoro, and Garcia for conversion and breach of contract with
interest from December 13, 2004;

G.  For an award of $580,000 with interest from April 7, 2007
against Itex, White, NYTO, Castoro, and Garcia for lost profits
as a result of conversions and breaches of contract;

H.  For an award of $3,510 against Itex for the return of
association fees with interest from April 18, 2002;

I.  For an award of $1,590 against Itex for the return of
association fees with interest from June 6, 2007;

J.  For an award of $721 against Itex, NYTO, and Castoro for
breach of contract and conversion of Onyx Restaurant gift
certificates with interest from April 2007;

K.    For an award of $1,686 against Itex for breach of contract and conversion of the balance in plaintiff's account with interest from June 6, 2007;

L.    For an order directing Itex to pay in United States dollars, within five (5) days, the positive account balances of members who either cancel their Itex membership or who are terminated by Itex;

M.    For an order directing Itex to provide a copy of the Agreement and Rules, and changes when they occur, to members.

N.    For an order finding breaches of the implied covenant of good faith and fair dealing in the Agreement and Rules that permit embezzlements from members' account, allow access to members' private account information without consent, permit unauthorized withdrawals from members' account, allow members' funds to be comingled with Itex's and Itex brokers'/franchisees' accounts, and permit Itex, its brokers/franchisees, and the staffs of both to give themselves a priority over members and siphon off desirable merchandise before reaching members.

O.    For an order declaring Itex's Spend Down Status null and void and ordering Itex to pay the positive account balance of

members who cancel their membership or are terminated to be paid in United States dollars within five (5) business days.

P.    For an award of $100,000 against White and Benson for conspiring to influence the outcome of an arbitration in favor of NYTO, Castoro, and Garcia;

Q.    For an order removing from Itex each defendant found to have breached his fiduciary duty to Itex or plaintiff;

R.    For a order returning all compensation paid by Itex to each defendant found to have breached a fiduciary duty to Itex or plaintiff to the maximum extent permitted by law;

S.    For attorneys fees to the extent permissible;

T.    For costs incurred herein;

U.    For other and further relief as the court may deem just, equitable, or proper.

## Count II

### Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. §§ 1961-68

### (against Itex, White, Best, Wade, Benson, NYTO, and Castoro)

49.    Plaintiff repeats and re-alleges the allegations contained in each of the preceding and succeeding paragraphs as if fully set forth in this Count.

50.    This Count is against Itex, White, Best, Wade, Benson, NYTO, and Castoro (the "RICO defendants") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

51.    Plaintiff sustained injuries to his business and property by reason of the

defendants' RICO violations.  He is entitled to be awarded treble damages,

the costs associated with this Count, and reasonable attorney's fees.

52.    The RICO defendants are a culpable association-in-fact criminal enterprise.

Their pattern of racketeering activity affects interstate commerce.

### Racketeering Activity

53.    The scope of the RICO defendants' nationwide racketeering activity is

substantial.

54.    To date, and for over a decade, the RICO defendants are illegally conducting

business in forty-seven (47) states[2] ("Itex's unauthorized states").  Itex's authority

to do business in Itex's unauthorized states was either revoked or never obtained.

55.    Itex launders millions of dollars of income from Itex's unauthorized states by

reporting on federal, state, and county tax returns that this income is obtained

legally.

56.    Despite not having the authority, Itex is doing a robust business through its

network of seventy-five (75) brokers/franchisees[3] and 9,070 Itex members in Itex's

---

2 Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.
3 ITEX in Birmingham (Birmingham, AL), ITEX in Gulf Shores (Orange Beach, AL), ITEX in Arizona (Phoenix, AZ), ITEX in Denver South (Denver, CO), ITEX in Denver (Denver, CO), ITEX in Fairfield (Fairfield, CT), ITEX East Fort Lauderdale - Oakland Park (Fort Lauderdale, FL), ITEX in Boynton Beach (Boynton Beach, FL), ITEX in Ft. Lauderdale - Plantation (Plantation, FL), ITEX in Lauderdale by the Sea (Southeast, FL), ITEX in Lauderdale by the Sea (Daytona Beach, FL), ITEX in Melbourne (Melbourne, FL), ITEX in Naples (Naples, FL), ITEX in Pompano Beach (Pompano Beach, FL), ITEX in St. Augustine (St. Augustine, FL), ITEX in St. Augustine (Sarasota, FL), ITEX in Tampa (Tampa, FL), ITEX in Tampa-Trinity

unauthorized states.

57.   The seventy-five (75) brokers/franchisees are paid a commission to promote merchandise available through Itex's marketplace. These brokers/franchisees promote this merchandise by regularly emailing 9,070 Itex members[4] in Itex's unauthorized states.

58.   . Except for NYS and NJ, the amount of Itex's sales in Itex's unauthorized states

---

(New Port Richey, FL), ITEX in Vero Beach (Vero Beach, FL), ITEX in Atlanta East (Savannah, GA), ITEX in Atlanta North (Atlanta, GA), ITEX in Boise (White Bird, ID), ITEX in Bloomington (Bloomington, IL), ITEX in Chicago (Chicago, IL), ITEX in Chicago North (Schaumburg, IL), ITEX in Peoria (Peoria, IL), ITEX in Columbus (Columbus, IN), ITEX in Indianapolis (Indianapolis, IN), Matthew Moots (Overland Park, KS), ITEX in Bowling Green (Bowling Green, KY), ITEX in Kentuckiana (Louisville, KY), ITEX in Louisville (Louisville, KY), ITEX in Boston (Waltham, MA), ITEX in Detroit (Highland, MI), ITEX in Grand Rapids (Grand Haven, MI), ITEX in Duluth (Duluth, MN), ITEX in Minneapolis East (Lake Elmo, MN), ITEX in Minneapolis North (Minneapolis / St Paul, MN), ITEX in Minneapolis South (Burnsville, MN), ITEX in Minneapolis West (Minneapolis, MN), ITEX in St. Louis (St Louis, MO), ITEX in Omaha (Ralston, NE), ITEX in Omaha West (Bennington, NE), ITEX in Las Vegas, (Las Vegas, NV), ITEX in Reno (Reno, NV), ITEX in Manhattan (Rahway, NJ), ITEX in Albuquerque (Albuquerque, NM), ITEX in Manhattan (New York, NY), ITEX in Charlotte (Charlotte, NC), ITEX in Raleigh (Raleigh, NC), ITEX in Wilmington (Carolina Beach, NC), David & Nikki Normant, ILB (Hayesville, OH), ITEX in Cincinnati (Cincinnati, OH), ITEX in Cleveland Central (Cleveland, OH), ITEX in Cleveland West (Cleveland, OH), ITEX in Columbus (Worthington, OH), ITEX in Oklahoma City (Oklahoma City, OK), ITEX in Tulsa (Tulsa, OK), ITEX in Portland North (Portland, OR), ITEX in Medford (Medford, OR), ITEX in Oregon City (Oregon City, OR), ITEX in Philadelphia (Jenkintown, PA), ITEX in Scranton (Dunmore, PA), ITEX in Knoxville (Knoxville, TN), ITEX in Nashville - Hendersonville (Hendersonville, TN), ITEX in Dallas Fort Worth (Dallas/Ft Worth, TX), ITEX in Houston (New Caney, TX), ITEX in Houston (Houston, TX), ITEX in Lubbock (Lubbock, TX), ITEX in San Antonio (San Antonio, TX), Timco, Inc. (Austin, TX), ITEX in Provo (Provo, UT), ITEX in Salt Lake City (Salt Lake City, UT), ITEX in Salt Lake City - North (N. Ogden, UT), and Atlantic Trade Exchange, Inc. (Virginia Beach, VA).

4 Alabama (353 members), Alaska (3), Arizona (162), Arkansas (16), Colorado (152), Connecticut (291), Delaware (1), Florida (1,300), Georgia (326), Hawaii (12), Idaho (134), Iowa (26), Illinois (393), Indiana (360), Kansas (20), Kentucky (353), Louisiana (19), Massachusetts (181), Maine (17), Maryland (20), Michigan (99), Minnesota (407), Mississippi (11), Missouri (98), Montana (9), Nebraska (325), New Hampshire (62), New Jersey (319), New Mexico (55), New York (350), North Carolina (407), North Dakota (2), Ohio (542), Oklahoma (291), Oregon (316), Pennsylvania (188), Rhode Island (8), South Carolina (44), South Dakota (1), Tennessee (187), Texas (678), Utah (397), Vermont (12), Virginia (63),

is only known to Itex.

**In New York State and New Jersey alone White, Best, and Wade
caused Itex to conceal and launder an estimated $150 million**

59.   On June 26, 2002, the New York State DOS annulled Itex's authority to

do business in NYS for failing to file the required tax returns and for not

paying the applicable taxes.  On March 16, 2011, the New Jersey DOT

revoked Itex's authority to do business in NJ for failing to file the required

tax returns and for not paying the applicable taxes.

60.   Itex claims its combined sales in NYS and NJ are $20 million "year after

year."  Accordingly, Itex concealed an estimated **$120 million** of sales in

NYS from December 26, 2002 to the present and concealed an estimated

**$30 million** of sales in NJ from March 16, 2011 to the present.  Itex

laundered and concealed this $150 million by reporting on its federal, state,

and local tax returns that these funds were legally obtained.

**White, Best, and Wade caused Itex to conceal and
launder an estimated $35,373,000 of income received
in association fees from Itex's unauthorized states**

61.   In the past ten (10) years, Itex laundered and failed to report an estimated

income of $35,373,000 in association fees received from its members in Itex's

unauthorized states.  Itex laundered and concealed this income by reporting on its

federal, state, and local tax returns the $35,373,000 was legally obtained.

62.   Itex has 9,070 members in Itex's unauthorized states.  The 9,070 members

paid, and continue to pay, Itex a $30 association fee every four (4) weeks (totaling

$272,100 per four-week cycle).  Annually, Itex receives $3,537,300 in association

West Virginia(1), Wisconsin (56), and Wyoming (3).

fees (13 four-week cycles per year X $272,100).  In the past ten (10) years, Itex

received **$35,373,000** of income from association fees ($3,537,300 per year X 10

years).

**White, Best, and Wade cause Itex to systemically comingle, embezzle,
and launder the funds of members whose transactions are incomplete**

63.    Incomplete transactions are systemically embezzled and laundered by Itex.  To

illustrate Itex's scheme, often when members purchase merchandise the funds are

transferred into, and comingled with, the broker's/franchises' account *and not*

*placed into the account of the Itex member who sold the merchandise.*  If the

transaction is not completed, the broker/franchisee will embezzle these funds by

not returning them.  Subsequently, Itex launders these funds by reporting on its

federal, state, and local tax returns that these funds were legally obtained.

64.    Members seeking to cancel their membership as a result of being embezzled

are prohibited from canceling their membership by Itex's Spend Down Status

(described above).  The embezzlements and laundering by reporting on federal,

state, and local tax returns that these funds were legally obtained cross state lines.

**White, Castoro, Garcia, and Benson caused Itex
to embezzle and launder $24,720 of plaintiff's funds**

65.    On December 26, 2002, Itex sold plaintiff $24,000 of advertising under

the pretext of selling advertising in the Daily News.  The transaction was not

completed. Interstate telephone, internet, and fax wires were used in this

transaction. The transaction was brokered by Garcia who advised the

plaintiff this advertising could be used in the future as needed.  Plaintiff paid

for this advertising with an Itex check payable to the Daily News in the

amount of $24,000. Itex withdrew the $24,000 (plus a $720 commission) from plaintiff's account.

66. On or about April 7, 2007, the Daily News refused to provide plaintiff with advertising and stated it neither authorized the sale of advertising to the plaintiff nor received plaintiff's Itex check for $24,000. Itex, White, Castoro, and Garcia refused to return and conspired to embezzle plaintiff's $24,720. Itex, White, Castoro, and Garcia shared plaintiff's $24,720 and laundered and concealed these funds by reporting on their federal, state, and local tax returns these funds were legally obtained. This money laundering and embezzlement crossed state lines.

67. Benson conspired, aided, and abetted this embezzlement and laundering by submitting an affidavit in the Supreme Court action that falsely claimed $24,000 was transferred to the Daily News on December 26, 2002. In affidavits from its executives, the Daily News clearly stated it did not receive plaintiff's $24,000.

68. Plaintiff's business and property was harmed by reason of these RICO violations.

**White, NYTO, Castoro, and Garcia caused Itex to
embezzle and launder $25,750 of plaintiff's funds**

69. On November 21, 2003, Itex sold plaintiff $25,000 of advertising. This transaction was niot completed. Interstate telephone, internet, and fax wires were used in this transaction. Although Cindy Aikens, Trade Director for Itex, initially contacted the plaintiff it was Garcia that brokered a separate transaction for plaintiff's purchase of $25,000 of advertising.

Garcia advised plaintiff the advertising could be used in the future as needed. Itex withdrew $25,000 (plus a $750 commission) from plaintiff's account.

70.    On or about April 7, 2007, Itex, White, NYTO, Castoro, and Garcia refused to return and conspired to embezzle plaintiff's $25,750. Itex, White, NYTO, Castoro, and Garcia shared plaintiff's $25,750 and laundered these funds by reporting on their federal, state, and local tax returns these funds were legally obtained. This laundering and embezzlement crossed state lines.

71.    Plaintiff's business and property was harmed by reason of these RICO violations.

**White, NYTO, Castoro, and Garcia caused Itex to
embezzle and launder $6,180 of eBuy-Sell's funds**

72.    On December 13, 2004, Itex sold eBuy-Sell $6,000 of advertising. Interstate internet wires were used in this transaction. This transaction was not completed. Itex withdrew $6,000 (plus a $180 commission) from eBuy-Sell's account.

73.    On or about April 7, 2007, Itex, White, NYTO, Castoro, and Garcia refused to return and conspired to embezzle eBuy-Sell's $6,180. Itex, White, NYTO, Castoro, and Garcia shared eBuy-Sell's $6,180 and laundered these funds by reporting on their federal, state, and local tax returns these funds were legally obtained. This laundering and embezzlement crossed state lines.

74.    EBuy-Sell's business and property was harmed by reason of these RICO violations.

**Itex embezzled $1,686.58 of eBuy-Sell's funds**

75.    On May 7, 2011, eBuy-Sell requested to cancel their Itex membership. Itex refused. To date, eBuy-Sell has a positive account balance of $1,686.58. Itex has refused to refund eBuy-Sell's $1,686.58. This embezzlement crossed state lines.

**Additional embezzlements**

76.    On February 19, 2012, John O'Meara stated he had "a major issue with Itex" and that Itex tried to take money from his account and shut him down. He also stated when his attorney contacted Itex "they stopped the nonsense."

77.    On February 23, 2014, Paul Blank stated that his account was "drawn down" between $3,000 and $5,000 a few years ago without his consent. Because of flooding at his home, he was unable to recover the related paperwork and stated "unequivocally that this happened to my account."

78.    On February 28, 2014, Jill Clarvit stated that on March 12, 2012, Itex converted $624 from her account.

79.    On February 24, 2014, Pearl Herzog stated that in April 2013 Itex converted "a little over $6,000" from her account.

80.    On February 25, 2014, Edward Dicken stated that on September 26, 2012 and on December 15, 2013, Itex converted $3,000 and $300, respectively, from his account.

81.    On April 4, 2014, Dr. Emil Chynn stated that from January to March 2013, Itex

embezzled $600 per month from his account.

**White, Best, and Wade are causing Itex to commit
systemic embezzlements and money launderings**

82.   White, Best, and Wade conspired and created the Agreement and Rules

as a mechanism to seize, embezzle, and launder the funds of Itex

members.  Interstate internet wires are used to transmit the Agreement,

Rules, and accomplish the embezzlements.

83.   Members entrust Itex with the funds in their Itex account.  When

members either cancel their Itex membership or are terminated, *Itex*

*refuses to release members' funds.*

84.   By connecting two Rules created by White, Best, and Wade a scheme to

embezzle and launder members' funds becomes obvious.

Rules at 2.4., <u>Member Eligibility</u>, in relevant part, states:

"We [Itex] reserve the right to approve, deny, suspend, or terminate
membership or use of an Account by any business or individual, **in our
sole discretion, for any reason or no reason.**" (emphasis added)

Rule 5.4., <u>Spend Down Status</u>, in relevant part, states:

"If either party terminates your Account and your Account has a positive
ITEX dollar balance (where sales exceed purchases), the Account may
be placed in "Spend Down status," after ITEX is paid any Fees then
owing **plus the transaction Fee on the positive balance.** Spend Down
status shall mean you will have twelve months to spend the positive
balance in your Account . . . At the end of the twelve-month period . . .
**ITEX, in its sole discretion, may terminate the Account, regardless
of any remaining positive ITEX dollar balance** or may opt to assess an
annual maintenance fee of $200 . . . until the Account's balance is
reduced to zero and the Account is closed. You may forfeit your positive
ITEX dollar balance by so instructing ITEX in writing and no further fees
will be assessed." (emphasis added)

85.    As demonstrated, Itex can terminate a member in its "sole discretion, or

for any reason or no reason."   The Rules permit the member to be placed

in Itex's Spend Down Status and be ordered pay to "the transaction Fee on

the positive balance."  As an example, a terminated member with a positive

account balance of $100,000 and a 7.5% commission rate has to

immediately pay $7,500 because terminated the member "for any reason or

no reason."   After a twelve-month period "ITEX, in its sole discretion, may

terminate the Account, regardless of any remaining positive ITEX dollar

balance" and embezzle the member's $100,000.  Itex would launder this

$100,000 by reporting on its federal, state, and local tax returns that these

funds were legally obtained.

**Castoro's extortion and attempt to deprive**
**plaintiff of his constitutional right to sue**

86.    The Supreme Court action was filed on May 25, 2007.  The defendants

were Itex, NYTO, Castoro, Garcia, et al.

87.    On June 4, 2007, Castoro telephoned plaintiff and angrily threatened that

if plaintiff did not withdraw the Supreme Court action Castoro would, "Sue

[plaintiff] for millions of dollars and put [plaintiff] out of business by seizing

and freezing [plaintiff's eBuy-Sell's] account."  Plaintiff declined to withdraw

the Supreme Court lawsuit.  This telephone call crossed state lines.

This was extortion.  If plaintiff did not immediately withdraw the Supreme

Court action, Itex would freeze plaintiff's eBuy-Sell's account (this is the

modern day equivalent of burning down plaintiff's business).

In addition, Castoro's threat was an attempt to deprive plaintiff of his constitutional right to sue. The right to sue is one of the highest and most essential privileges of citizenship.

88.    Castoro executed his threat. Itex froze plaintiff's eBuy-Sell account. On June 6, 2007, in an email, Castoro advised that plaintiff's eBuy-Sell account was "frozen do [sic] to pending litigation." This abruptly put eBuy-Sell and plaintiff out of business. The resultant harm was foreseeable. This email crossed state lines.

89.    Plaintiff's business and property were harmed by reason of Itex's and Castoro's RICO violations. As a result, plaintiff suffered $580,000 in lost profits.

**Itex, NYTO, Castoro, and Garcia promoted illegal interstate gambling and collected unlawful debts**

90.    On February 11, 2011, Castoro emailed approximately 669 Itex members in NYS and NJ, including plaintiff, to promote an "ITEX Texas Holdem Tournament" held at Fire & Ice in NJ on February 17, 2011. The email stated "don't miss out!!!!!" and to call Castoro or Garcia at 732-669-9300 for details. Gamblers each paid Itex a $500 "buy-in" fee and Itex "cut the pot" by charging gamblers up to 15% on the amounts they both won and lost. In excess of five (5) persons participated in the promotion and organizing of this gambling event and the proceeds exceeded $5,000. Itex's emails promoting this gambling event crossed state lines and the proceeds were laundered by reporting on Itex's 2011 federal, state, and local tax returns these funds were legally obtained.

91.   On May 10, 2011, June 1, 2011, and June 7, 2011, Itex emailed approximately 669 Itex members in NYS and NJ, including plaintiff, on each of these days to promote an "ITEX Hold-Em Poker Tournament" held at Fire & Ice in NJ on June 9, 2011.  The email stated "don't miss out!!!!!" and to call Castoro or Garcia at 732-669-9300 for details.  Gamblers each paid Itex a $500 "buy-in" fee and Itex "cut the pot" by charging gamblers up to 15% on the amounts they both won and lost.  In excess of five (5) persons participated in the promotion and organizing of this gambling event and the proceeds exceeded $5,000.  Itex's emails promoting this gambling event crossed state lines and the proceeds were laundered by reporting on Itex's 2011 federal, state, and local tax returns these funds were legally obtained.

92.   On February 1, 2012, Garcia emailed approximately 669 Itex members in NYS and NJ, including Patricia Adams and plaintiff, to promote gambling on sports Super Bowl XLVI that was held on February 5, 2012.  These emails crossed state lines.  Itex received bets in multiples of $250 and promoted this gambling by stating three (3) winners would receive $5,000, one (1) winner would receive $10,000, and that gamblers "had a chance of turning $250 into $25,000."  In addition to receiving bets in multiples of $250, Itex "cut the pot" by charging gamblers up to 15% on the amounts they both won and lost.  On February 6, 2012, Itex members, including Patricia Adams, were emailed notice of the winners.  This email crossed state lines.  Patricia Adams was not a winner and Itex deducted two unlawful debts of $250 each ($500) from her account plus a cut of approximately 10% of her $500 loss.  In excess of five (5) persons participated in

the promotion and organizing of this sports gambling event. Itex laundered the proceeds, which were in excess of $5,000, by reporting on its 2012 federal, state, and local tax returns these funds were legally obtained.

## The Securities and Exchange Commission

93.    Itex and its executives were prosecuted multiple times by the SEC.

94.    On February 4, 2000, one of the prosecutions was settled. The SEC permanently enjoined Itex from, *inter alia,* defrauding investors "by designating the value of many Itex's assets and transactions in 'trade dollars' rather than their far lower U.S.-dollar fair market values on its financial statements" and stated "the goods and services exchanged were grossly overvalued" (*SEC v. Itex Corporation, et al.* (CV 99-1361 BR).

95.    It appears that Itex is again inflating, or allowing to be inflated, the value of goods and services exchanged through Itex's marketplace.

96.    On February 20, 2012, Frances Kiperman stated that Itex was engaged in price gouging. Specifically, Vera Wang sunglasses that regularly sell for $128 was being promoted by Itex for $275.

97.    On March 9, 2014, Len Shapiro advised plaintiff that Itex promoted services "at a grossly inflated cost."

98.    Plaintiff's business and property were harmed by reason of defendants' RICO violations.

99.    WHEREFORE, plaintiff requests this court to enter judgment against the defendants as follows:

A.    Enjoining Itex from doing business in Itex's unauthorized

      states until proper authorized is obtained;

B.    For an order directing Itex to file the required tax returns

      and pay the applicable taxes due to the United States and

      Itex's unauthorized states;

C.    For an order directing Itex, White, Castoro, and Garcia to

      return plaintiff's $24,720 and interest from December 26, 2002

      *trebled;*

D.    For an order directing Benson to pay $24,000 and interest

      from December 26, 2002, *trebled,* for conspiring to conceal

      plaintiff's $24,000;

E.    For an order directing Itex, White, NYTO, Castoro, and

      Garcia to return plaintiff's $25,750 and interest from November

      21, 2003 *trebled;*

F.    For an order directing Itex, White, NYTO, Castoro, and

      Garcia to return plaintiff's $6,180 and interest from December

      13, 2004 *trebled;*

G.    For an order directing Itex to return the positive balance in

      plaintiff's account of $1,686.58 and interest from May 7, 2011,

      *trebled.*

H.    An order directing Itex to pay in United States

      dollars, within five (5) days, the positive account

balances of members who either cancel their Itex membership or who are terminated by Itex;

I.      For an order nullifying and voiding Rule 2.4.<u>Member Eligibility</u> and Rule 5.4. <u>Spend Down Status</u> contained in the Rules;

J.      For an order prohibiting Itex, brokers, and franchisees from comingling their funds with members' funds;

K.      For an order directing Itex, brokers, and franchisees to return the funds held by them for transactions that were not completed by Itex members;

L.      For an award of $580,000 against Itex and Castoro for extortion, attempted deprivation rights, lost profits, and interest from June 6, 2007 *trebled;*

M.      For an order prohibiting Itex, NYTO, Castoro, Garcia, brokers, and franchisees from participating in and promoting illegal gambling;

N.      For an order sanctioning Itex for violating the SEC order of February 4, 2000.

O.      For removal from Itex of each defendant found to have breached his fiduciary duty to Itex;

P.      For the return of all compensation that Itex paid the defendants during the period of their fiduciary breach to Itex to the maximum extent permitted by law;

Q.  For attorneys fees to the extent permissible;

R.   For costs incurred herein;

S.  For other and further relief as the court may deem

just, equitable, or proper.

### Count III
**Shareholder Derivative Action on behalf of Itex
against White, Best, Wade, and Benson
Federal Rules of Civil Procedure – Rule 23.1
U.S. Securities and Exchange Commission Rule 14a-7**

**(against White, Best, and Wade)**

100.  Plaintiff repeats and re-alleges the allegations contained in each of the

preceding and succeeding paragraphs as if fully set forth in this Count.

101.  Plaintiff brings this Count derivatively on behalf of ITEX to redress

injuries suffered, and yet to be suffered, by Itex as a direct and

proximate result of the breaches of fiduciary duty and other wrongdoing

by White, Best, Wade, Benson (collectively, "the defendants"). Plaintiff

seeks to enjoin further such conduct.

102.  Plaintiff is an Itex shareholder. On January 24, 2013, plaintiff purchased

twenty-five (25) shares of Itex stock. Plaintiff was an Itex shareholder or

Itex member at the time of the transactions complained of herein.

103.  Plaintiff states this action is not a collusive one to confer jurisdiction that

the court would otherwise lack. Plaintiff will adequately and fairly

represent the interests of Itex and its shareholders in enforcing Itex's

rights.

104.  By reason of the defendants' positions as officers, directors, and/or

fiduciaries of Itex, and because of their ability to control its business and

corporate affairs, these defendants owed Itex and its shareholders fiduciary obligations that included candor, good faith, care, loyalty, compliance with applicable laws, and were and are required to use their utmost ability to control and manage Itex in a fair, just, honest, and equitable manner. The defendants were and are required to act in furtherance of the best interests of Itex and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

105. Plaintiff is a non-controlling shareholder of Itex who is proceeding derivatively on behalf of Itex and is the proper party to prosecute this lawsuit.

**Demand futility**

106. Because the defendants committed the wrongdoing alleged herein, they cannot reasonably be expected to initiate litigation on Itex's behalf. Each defendant played a central role in the breaches of fiduciary duty and faces a substantial likelihood of personal liability as a result of their actions and conscious failures to act. In fact, this would require them to pursue litigation against themselves.

**Suppression of shareholder democracy**

107. The defendants violated their fiduciary duty to Itex by suppressing shareholder democracy of the election and voting held on December 13, 2013.

**The defendants concealed shareholder information**

108. On May 4, 2013, in accordance with SEC Rule 14a-7, plaintiff demanded the contact information of Itex's shareholders to democratically

communicate with shareholders prior to the election of directors and the voting upon other matters held on December 13, 2013 (the "election").

109. Plaintiff's demand for shareholder information was made to Jeremy S. Goldman ("Goldman"), Itex's attorney. Goldman forwarded plaintiff's demand to Stephen Tollefsen, Itex's "experienced securities lawyer."

110. SEC Rule 14a-7 required the defendants to provide plaintiff with the shareholder information within five (5) business days.

111. To date, despite the passage of eleven (11) months, the defendants have not provided plaintiff with shareholder information.

112. As a result, the defendants intentionally suppressed democratic participation in the election.

**The defendants "rigged" the December 13, 2013**
**election in favor of themselves**

113. The defendants engaged in a series of corporate transactions designed to suppress shareholder democracy to rig, or attempt to rig, the outcome of the election held December 13, 2013 in favor of themselves..

114. The defendants were elected on December 13, 2013.

115. The defendants scheme to rig the election began March 25, 2011.

116. Without share holder approval, between March 25, 2011 and April 5, 2011, the defendants reshaped control over Itex in an attempt to improperly assure they retain a majority of shareholder votes. A poison pill enacted which restricts shareholder groups from accumulating more than 15% of Itex's common stock, became effective March 25, 2011. Without shareholder approval, in the twelve (12) days that followed the

defendants improperly assured themselves that 438,000 new shares would vote in their favor at the December 13, 2013 election through a series of three transactions.

(a)     On March 30, 2011, the defendants caused Itex to sell 151,000 shares within the Itex Broker Network for the discounted price of $4 per share and, as a significant term of the transaction, defendants personally retained the voting rights over these shares and assured themselves the right to vote the 151,000 shares.

(b)     On March 30, 2011, White and Wade granted themselves 195,000 restricted shares (over and above generous compensation they receive from Itex and unvested shares they already own). In effect, the defendants embezzled 195,000 shares of Itex's stock and both lined their pockets with hundreds of thousands of dollars and allowed for the dilution of independent shareholders, to reward themselves and brokers and officers under their control. Defendants did not even require that their affiliates who received shares pay cash. Rather, the purchase price is payable by six-year promissory notes.

(c)     On April 5, 2011, the defendants caused Itex to repurchase 92,000 shares at the premium price of $4.50 share (despite having sold shares at a discount days earlier) in an effort to limit shares actually voted. Thus, the defendants suppressed shareholder democracy by improperly assuring themselves an additional 16% block of voted shares - for no consideration that they paid – while simultaneously restricting other

shareholders from acquiring substantial additional votes.

117. Instead of promoting shareholder democracy, the defendants, who have a long history of shared business dealings with each other prior to, and outside of, ITEX, chose to entrench their position within Itex and ensure that it is unreasonably difficult for any shareholder who disagrees with their policies to wrest such control. The defendants have taken every opportunity to enrich themselves at Itex's expense, consistently rewarding and entrenching themselves. White rewards those close to him with Itex's funds, including appointing his son to a position working for one of Itex's brokers. The appointment of White's son was not disclosed in Itex's public filings.

118. Defendants' business dealings include White serving as a past director of Morse Best, a company founded by Best. Best is the CEO of Mercent Corp., a company that employs Wade as its Finance Director.

119. Institutional Shareholder Services ("ISS"), the nation's preeminent proxy advisory firm, considers Best an "affiliated outsider" and disputed that Wade was independent.

120. White and Wade caused Itex to pay Best $100,000 for "consulting services" at a time when Best's company (Morse Best) was struggling between 2005 and 2007. There was no competitive bidding for these consulting services, no apparent need for these consulting services, and no demonstrable results of Best's consulting services.

**Plaintiff demands a complete and impartial accounting**

      121.  The SEC has prosecuted Itex and it executives multiple times for accounting fraud.

      122.  Ehrhardt Keefe Steiner & Hottman PC, ("EKSH") the accounting firm hired by Itex, stated their evaluations of Itex's financial condition were based on the financial statements *prepared by White*. EKSH would not "express an opinion on the effectiveness [of White's] internal control over financial reporting." As a result, Itex's internal controls and methods of financial accounting have not been *independently evaluated*.

      123.  Plaintiff is a shareholder and demands an independent evaluation of Itex's internal controls and methods of financial accounting.

***Polonitza* v. *White, Best, and Wade***

      154.  David Polonitza, an Itex shareholder, filed a derivative action against White, Best, and Wade (*David Polonitza v. Steven White, Eric Best, and John Wade,* Superior Court of the State of Washington for King County, No. 11-2-30760-3 SEA). A settlement was reached on behalf of Itex and its shareholders on December 28, 2012. The defendants have not provided a copy of that settlement to shareholders.

      155.  Plaintiff demands a copy of that settlement.

**White and Benson breached their fiduciary duty to Itex and its shareholders by conspiring and embezzling Itex's funds to improperly influence an arbitration of their business associates**

      124.  White and Benson are business the associates of NYTO, Castoro, and Garcia ("White's business associates"). In 2009, plaintiff commenced

arbitration against White's business associates that was conducted by the American Arbitration Association ("AAA"), Case No. 75 148 00320 09 GLO.

125. *Itex, White, and Benson were not parties in the arbitration.*

126. White and Benson attempted to improperly influence the arbitrator with Itex's funds. On March 26, 2010, White, who was not party to the arbitration, sent the arbitrator a letter and, subsequently, $1,650 of Itex's funds with an additional offer of $55,000 to settle the arbitration in favor of White's business associates. White's and Benson's apparent intention was to influence the arbitrator to force plaintiff into accepting the $1,650 and $55,000 to settle the arbitration.

127. On April 3, 2010, the arbitrator stated White's conduct was "inappropriate", requested "ITEX Corporation to cease communication with the arbitrator", and returned the $1,650.

128. On April 6, 2010, Benson, who was also not a party to the arbitration, made a less than graceful attempt to cover up for White's attempt to influence the arbitrator. Benson wrote the arbitrator claiming that White's March 26, 2010 letter, clearly signed by White, and White's forwarding the $1,650 to the arbitrator with an offer of an additional $55,000, was somehow not from White *but from Benson.*

129. White's withdrawal of $1,650 of Itex's funds without shareholder approval to pay for the arbitral settlement of his business associates meets the threshold of embezzlement.

**The defendants are causing Itex to operate as an**
***unlicensed* and *unbonded* nationwide financial institution**

130.  Itex is a nationwide online financial institution.  Itex opens accounts,

accepts deposits, makes withdrawals, issues checks, issues debit cards,

transfers funds,  issues monthly statements, makes interest bearing loans,

and annually reports each member's sales activity to the IRS on form

1099B.

131.  The defendants have failed a fiduciary duty to comply with the applicable

licensing requirements for financial institutions, including failing to insure the

deposits of its member.

**The defendants cause Itex to illegally**
**conduct business in forty-seven (47) states**

132.  Itex is illegally conducting business in forty-seven (47) states  (see

footnote 2 for a list of the states).

133.  The defendants failed their fiduciary responsibility to comply with the

applicable tax laws of forty-seven (47) states.  The consequences are

enormous.

134.  The defendants caused Itex to conceal millions of dollars of income from

these states, fail to file the required tax forms, and fail to pay the applicable

taxes.

135.  The defendants, personally, should pay for the penalties, late fees,

interest, and other charges associated with their fiduciary failure to comply

with applicable tax laws.

136.  Itex's income from association fees alone (*not including commissions on*

*transactions)* from these forty-seven (47) states in the past ten (10) years is estimated at **$35,373,000**. The defendants caused Itex to launder these funds by reporting on federal, state, and local tax returns the $35,373,000 was obtained legally.

137. The defendants have caused Itex to be exposed to an enormous tax burden, late penalties, interest charges, related costs, *and criminal prosecutions.*

138. New York Tax Law – Part 2 - § 1809 *Corporate Taxes; Repeated Failure to File* advises corporations that "fail to file a return or report for three consecutive taxable years shall be guilty of a *class E felony.*

**In New York State and New Jersey alone the defendants caused Itex to conceal an estimated $150 million of its income**

139. On June 26, 2002, the New York State DOS annulled Itex's authority to do business in NYS for failing to file the required tax returns and not paying the applicable taxes. On March 16, 2011, the New Jersey DOT revoked Itex's authority to do business in NJ for failing to file the required tax returns and not paying the applicable taxes.

140. Itex's website states that its combined sales in NYS and NJ are $20 million "year after year."

141. *Not including association fees,* the defendants caused to conceal an estimated $120 million of its sales in NYS from December 26, 2002 to the present and conceal an estimated $30 million of its sales in NJ from March 16, 2011 to the present.

142. WHEREFORE, plaintiff, on behalf of Itex, requests relief as follows:

        A.     For an order voiding the December 13, 2013 election for the Directors of Itex and other matters;

        B.     For an order directing the defendants to comply with the applicable tax laws of the United States and state and local tax authorities and to pay, personally, all penalties, late fees, interest charges, and other costs as a result of breaching their fiduciary duty;

        C.     For an order directing the defendants to obtain the licensing required for financial institutions;

        D.     For an order directing the defendants to obtain an independent professional evaluation of Itex's internal control over financial accounting;

        E.     Enjoining the defendants from suppressing shareholder democracy;

        F.     For an order directing defendants to provide plaintiff with the contact information of Itex's shareholders;

        G.     For an order directing defendant Best to return approximately $100,000 improperly obtained from Itex;

        H.     For an order directing defendants to provide shareholders with the December 28, 2012 settlement reached in *Polonitza v. White, Best, and Wade;*

I. For an order enjoining defendant White from using Itex's funds to settle lawsuits and arbitrations that Itex is not a party;

J. For rescission of all transactions found to be improper;

K. For damages against and/or restitution from defendants in an amount to be proven at trial;

L. For removal of each defendant found to have breached a fiduciary duty to Itex;

M. For the return of all compensation paid by Itex to each defendant found to have breached a fiduciary duty to Itex to the maximum extent permitted by law;

N. For attorneys' fees to the extent permissible;

O. For the costs of this Count.

P. For pre-judgment and post-judgment interest to the extent permissible;

Q. For other and further relief as this court may deem just, equitable, or proper.

## Count IV

### Violations of Constitutional and Civil Rights

### (against Itex, NYTO, Castoro, and Garcia)

143. Plaintiff repeats and re-alleges the allegations contained in each of the preceding paragraphs as if fully set forth in this Count.

144. Itex, NYTO, Castoro, and Garcia (the "defendants") violated, or attempted to violate, plaintiff's constitutional and civil rights.

145. The defendants failed to advise the Supreme Court action that Itex and NYTO were *unauthorized foreign corporations illegally doing business in NYS*. This failure led to a denial of plaintiff's right to a fair and speedy resolution of the issues presented to the Supreme Court action.

146. NYTO, Castoro, and Garcia attempted to chill plaintiff's 1st amendment rights by maliciously filing requests for a Temporary Restraining Order and Preliminary Injunction to silent plaintiff's legitimate speech. On March 26, 2013, the Supreme Court action denied the requests.

147. Itex "sewer served" the Notice of Entry, dated February 6, 2008, of the Supreme Court action's January 14, 2008 decision. Itex, on notice of plaintiff's temporary address outside of the United States, mailed the Notice of Entry to plaintiff's New York City address knowing that plaintiff would not receive it until the time to file a Notice of Appeal had passed, thereby denying plaintiff of his right to appeal the January 14, 2008 decision.

148. WHEREFORE, plaintiff requests this court to enter judgment against the defendants as follows:

    A.    For a $100,000 judgment against Itex, NYTO, and Castoro for concealing that Itex and NYTO are *unauthorized foreign corporations* illegally doing business in NYS which denied plaintiff's right to a fair and speedy trial.

    B.    For a $100,000 judgment against NYTO, Castoro, and Garcia for malicious prosecution in attempting to chill plaintiff's 1st amendment rights.

C.    For a $100,000 judgment against Itex for "sewer serving" plaintiff to deny plaintiff his right to appeal the Supreme Court action's decision of January 14, 2008.

Dated:  April 9, 2014

John Bal, Agent
85 Kenmare Street #35
New York, NY 10012
(212) 966-7576

## AFFIDAVIT OF VERIFICATION

I, John Andries Bal, Jr., in esse and sui juris, the sole secured beneficiary and agent of the business trust debtor organization JOHN ANDRIES BAL, JR., being duly sworn, depose and say under penalty of perjury:

I have read the above complaint and causes of action and I know its contents; the facts stated herein are true to my own personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. The grounds of my belief as to all matters not stated are upon my belief derived from third-parties, books and records, and personal knowledge, except as to those stated upon information and belief, and as to those matters I believe them to be true.

Dated: April 9, 2014

John Bal, Agent

## Affirmation of Service (electronic mail)

I, John Bal, plaintiff herein, affirms under penalty of perjury that on april 9, 2014 I served Jeremy S. Goldman and Joseph Maira, attorneys for the defendants by electronic mail.

John Bal
agent

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Docket No. 13 CV 6794 (CM)

--------------------------------------------------x

BUSINESS WATCHDOG, MERGENT
SERVICES, and JOHN ANDRIES BAL, JR.,

                                        Plaintiffs,

                    -v-

ITEX CORPORATION, STEVEN WHITE
personally and in the capacity of CEO, CFO,
and Chairman of the Board, ERIC BEST,
personally and in the capacity of Director,
JOHN WADE, personally and in the capacity
of Director, ROBERT BENSON, personally
and in the capacity of Vice President, NYTO
TRADE INCORPORATED, JOHN CASTORO
aka NYTO TRADE INCORPORATION aka
NYTO TRADING CORPORATION aka NYTO
TRADE EXCHANGE and 44 TRADE
CORPORATION, aka NYTO TRADE, INC.,
personally and in the capacity of President,
and IZZY GARCIA, personally and in the
capacity of Manager,

                                        Defendants.

--------------------------------------------------x

FIRST AMENDED COMPLAINT

JOHN ANDRIES BAL, JR., pro se
85 Kenmare Street #35
New York, NY 10012
(212) 966-7576
MERGENTserv@msn.com

QA
INTL PRIORITY CLR
ISR CLR
10007
NY US
EWR

QB PCTA

FedEx
Trk#
0402 8984 4098 1574

670214 ANC 04/10 513G1/78D9/AA44

FID 98Z943 9949814 CNKA 51NC1/78D9/5SDD

Do not ship liquids, blood or diagnostics in this

**FedEx Express**  **International Air Waybill**

**1 From**

Date 04/09/201

Sender's FedEx Account Number 368045446

Sender's Name John Bal    Phone 212-966-757

Company Mergent Services

Address 85 Kenmare St. #35

Address

City New York    State/Province NY

Country USA    ZIP/Postal Code 10012

**2 To**

Recipient's Name PRO SE OFFICE    Phone 212-805-0175

Company United States District Court

Address/Dept/Floor United State Courthouse

Address 500 Pearl Street, Room 200

City New York    State/Province NY

Country USA    ZIP/Postal Code 10007

Recipient's Tax ID Number for Customs Purposes

**3 Shipment Information**

Total Packages    Total Weight 1    DIM

Commodity Description LEGAL DOCUMENTS    Harmonized Code    Country of Manufacture TH    Value for Customs

Envelope

FedEx Express

Extremely Urd

Insert air waybill here ▶

100% Recycle
Recycled
Paperboard