UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

BUSINESS WATCHDOG, MERGENT        :
SERVICES, and JOHN ANDRIES BAL, JR.,

        :

        Plaintiffs,        :

     -v-     :

ITEX CORPORATION, STEVEN WHITE,      :
personally and in the capacity of CEO, CFO,   :
and Chairman of the Board, ERIC BEST,
personally and in the capacity of Director,    :
JOHN WADE, personally and in the capacity
of Director, ROBERT BENSON, personally    :
and in the capacity of Vice President, NYTO
TRADE INCORPORATED, JOHN CASTORO   :
aka NYTO TRADE INCORPORATION aka
NYTO TRADING CORPORATION aka NYTO   :
TRADE EXCHANGE and 44 TRADE
CORPORATION, aka NYTO TRADE, INC.,    :
personally and in the capacity of President,
and IZZY GARCIA, personally and in the    :
capacity of Manager,

        :

       Defendants.    :

        :

-------------------------------------------------------------x

13 Civ. 6794 (CM)

**PLAINTIFFS'
AFFIRMATION IN
*OPPOSITION* TO
DEFENDANTS'
MOTIONS TO DISMISS
THE FIRST AMENDED
COMPLAINT**

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 8\|11\|14 |

## PLAINTIFFS' AFFIRMATION IN *OPPOSITION*
## TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff JOHN ANDRIES BAL, JR., affirms as follows:

1.     I am the owner of Mergent Services (a sole proprietorship) and founder of

Business Watchdog, a consumer advocacy organization.  I am also an ITEX

shareholder and ITEX member, agent for JOHN ANDRIES BAL, JR., and acting

in the capacity of Private Attorney General[1]. The allegations herein are made upon information and belief.

I am the sole owner of eBuy-Sell.com, Inc. ("eBuy-Sell"). On July 7, 2014, eBuy- Sell, the assignor, made an assignment of this lawsuit to me, the assignee (Exhibit 1). The assignment permits me to represent eBuy-Sell[2].

I am a private citizen of the United States and, as I understand my status, have standing as a public officer by way of being a Private Attorney General.

2.    The defendants are ITEX Corporation ("ITEX"), Steven White ("White"), CEO, CFO, and Chairman of the Board of Directors of ITEX, Eric Best ("Best"), Director of ITEX, John Wade ("Wade"), Director of ITEX, Robert Benson ("Benson"), Vice President of ITEX, NYTO Trade Incorporated ("NYTO"), John Castoro ("Castoro"), former Vice President of ITEX and current President of NYTO, and Izzy Garcia ("Garcia"), Manager of NYTO (collectively, the "defendants", "RICO defendants", or "derivative defendants").

3.    I have been an ITEX member since Aril 18, 2002 (Exhibit 2A) and a Shareholder since January 24, 2013 (Exhibit 2B).

4.    At the heart of this litigation is the wrongdoing that the defendants are doing in the name of ITEX.

---

1 Private Attorney General is an equitable doctrine that allows a private citizen to bring a lawsuit in the public's interest. The Private Attorney General doctrine first appeared in the decision of the Honorable Jerome Frank of the 2nd Circuit U.S. Court of Appeals (*Assoc. Indus. of New York* v. *Ickes*, 134 F.2d 694, 704 (2d Cir. 1943). More recently, in *Holmes v. SIPC*, 503 U.S. 283 (1992), a RICO case, Justice O'Connor pointed to Congress' purpose of bringing "the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources" are inadequate.

5.  Initially, in 2007, I sought the return of $56,650 that the defendants embezzled from my account. My efforts for the return of my funds were unsuccessful and, as I researched ITEX, I discovered systemic patterns of criminality and harm being done to shareholders, brokers, and members.

**Request to expedited court proceedings**

6.  I am a nearly 70-year old Vietnam era veteran who has had surgery performed at the Hospital for Joint Diseases, 301 East 17th Street, New York, NY, Beth Israel Medical Center, 10 Union Square East, New York, NY, and multiple surgeries at the Veterans Hospital at 423 East 23rd Street, New York, NY. Additional surgeries are likely. My medical condition, in part, may be caused by the 9/11 terrorist attack on the World Trade Center ("WTC"). Following the collapse of the towers, as a volunteer, I went to the WTC site to assist victims. I was exposed to dangerous levels of toxins. My medical condition is being tracked by the WTC Health Registry. Unlike fine red wine, my medical condition has not improved with age.

7.  I explain this because I learned that my age, health, or financial situation may entitle me to expedited court proceedings. The defendants embezzled $56,650 of my funds, froze my ITEX business account, are withholding the balance in my account, and, since June 6, 2007, put me out of business.

---

2 I respectfully ask that eBuy-Sell be added as a plaintiff.

monthly Vietnam Veterans disability payment of $985 and food stamps. To compound my financial situation, the defendants have forced me to incur costs and other burdens of litigation to obtain the return of my funds.

**I respectfully ask that the court not be misled by the defendants'
attempts to portray me as an irresponsible person**

9.    The defendants are serial felons and fraudsters.  An apparent strategy is to distract the court's attention away from their wrongdoing by attempting to portray me as an irresponsible person.

10.    I have been a businessman most of my life and the plaintiff in several mostly business-related court actions.

11.    The defendants have selectively cited two *irrelevant* unfavorable court decisions that I received in my nearly 40 years as a businessman.

12.    I respectfully ask the court not to be misled by the defendants' attempts to portray me as an irresponsible person.

**The Securities and Exchange Commission ("SEC")**

13.    ITEX has a history of fraudulent statements and conduct.  The SEC prosecuted ITEX and its executives for defrauding shareholders and submitting fraudulent accounting statements (Exhibit 3).

### I ALLEGED FOUR COUNTS AGAINST THE DEFENDANTS

**Count I
Conversions, Breaches of Fiduciary and Contractual Duties,
Breaches of the Implied Covenant of Good Faith and Fair Dealing,
and Tortuous Interference with my Business Relationships**

8.      I am humbled.  I eventually exhausted my savings and am living on a

**ITEX has a fiduciary duty to its members**

14.     It is common knowledge that ITEX has a fiduciary relationship with its members.

15.     Barter News, the leading trade publication for the barter industry, publically states that:

> "Under the Tax & Equity Fiscal Responsibility Act of 1982 (TEFRA Act) trade exchanges [including ITEX] are classified as third-party record keepers, having **the same fiduciary obligations as bankers, and stock (securities) brokers**." (emphasis added) (Exhibit 4)

16.     The trust placed in, and accepted by, ITEX goes much deeper than that of bankers and securities brokers. In fact, the level of trust placed in ITEX by its members goes far beyond the threshold required to establish a fiduciary relationship. Members entrust ITEX with:

a)  Transfer and possession of their funds pending completion of transactions between members;

b)  Unilaterally accessing private financial information in members' ITEX account;

c)  Maintaining members' ITEX bank account and making deposits to, and withdrawals from, this account;

d)  Storing and maintaining members' private social security card information;

e)  Storing and maintaining members' private employer identification number;

f) Storing and maintaining members' private credit card information and entrusting ITEX to use that information to make payments to itself;

g) Storing and maintaining members' private banking account information and entrusting ITEX to use that information to make payments to itself;

h) Issuing and maintaining an ITEX debit card for each member;

i) Giving marketing, sales, and purchasing advice to members;

j) Recording members' sales and purchases;

k) Invoicing commissions on members' sales and purchases; and

l) Recording and reporting members' sales to the IRS on form 1099B.

As a fiduciary, among other obligations, ITEX must act with the highest level of honesty known in law, act in the best interests of their members, avoid even "appearances" of conflicts of interest, and obey all applicable laws, including tax laws.

17.    As demonstrated herein, ITEX's fiduciary breaches are rampant.

**Breaches of the Implied Covenant of Good Faith and Fair Dealing**

18.    Under New York law, the covenant of good faith and fair dealing is implicit in every contract. *511 W. 232nd Owners Corp. v. Jennifer Realty Corp.*, 773 N.E.2d 496, 500 (N.Y.2002).

19.    There is controlling authority that the covenant of good faith and fair dealing can be used to interpret the duties of the parties to a contract and can be used by a plaintiff as a basis for the plaintiff's claim that the contract between the parties was breached. See *Dalton*, 663 N.E.2d at 293 (using covenant of good

- 6 -

faith and fair dealing to support plaintiff's claim that defendant's testing firm breached its contract with the plaintiff); see also *Dweck Law Firm , L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358–59 (S.D.N.Y. 2004); *1-10 Indus. Assocs., LLC v. Trim Corp.*, 747 N.Y.S.2d 29, 31 (App. Div. 2002).

20.     ITEX has 22,000 members throughout the United States, Canada, and Panama. ITEX conducts business with its members in all 50 states, Canada, and Panama. ITEX continually breaches the implied covenant of good faith and fair dealing by concealing fromits members, including me, that <u>ITEX is unlawfully conducting business in 47 states</u>. There is either no record of ITEX having the authority to do business in these states or ITEX's authority was revoked for evading payment of taxes and tax filings (Exhibit 5).

21.     Using NYS as the example, on December 29, 1999, the NYS Department of State ("DOS") annulled ITEX's authority to do business in NYS as a *domestic* corporation (Exhibit 6) for evading payment of taxes and tax filings. On June 26, 2002, the DOS annulled ITEX's authority to do business in NYS as a *foreign* corporation (Exhibit 7) for evading taxes and tax filings. Despite the annulments, ITEX, to date, has boldly continued doing a robust business in NYS since 1999 and continually evaded payment of taxes and tax filings.

22.     NYTO, ITEX's broker in NYS never obtained the required authority from DOS to do business in NYS (Exhibit 8). Despite not having the authority, NYTO (and its predecessor companies), to date, has continued

- 7 -

doing robust sales for ITEX in NYS since 1999 and continually evaded payment of taxes and tax filings.

23.    ITEX's concealment that it was not authorized to do business in 47 states fraudulently caused me to pay ITEX $395 to become member, $3,510 association fees, and $6,788.13 commissions. I demand the return of these funds.

## Breaches of contracts

24.    I have been a continuous ITEX member since April 18, 2002 (Exhibit 2) and shareholder since January 24, 2013 (Exhibit 9).

25.    On December 26, 2002 (Exhibit 10), November 21, 2003 (Exhibit 11), and December 13, 2004[3] (Exhibit 12), under the pretext of selling me advertising for future use, ITEX withdrew a total, including commssions, of $56,650 from my account.

26.    On or about April 7, 2007, ITEX breached these three agreements by refusing to provide me with either the advertising that I purchased or refund my $56,650. My direct appeal to White was denied  (Exhibit 34).

27.    On May 25, 2007, I filed a lawsuit in the New York State Supreme Court, New York County, *Mergent Services and John Bal v. ITEX Corporation, et al.,* Index No. 601777/2007 (the "State Court lawsuit', "State Court", or "lawsuit"). The lawsuit, among other things, sought the return of my $56,650 (Exhibit 13).

28.    ITEX, to date, has never denied taking my $56,650 and not providing anything in return.

---

3 This purchase was made by eBuy-Sell.

29.     On March 26, 2013, the State Court dismissed the complaint. The dismissal was not based on the merits of the complaint (Exhibit 14),

30.     Despite the passage of nearly six years, seven of the eight defendants did not answer the complaint and no discovery was conducted.

**ITEX tortuously interfered with my business relationships**

31.     On May 25, 2007, I filed the State Court lawsuit against ITEX, NYTO, Castoro, et al. (Exhibit 13).

32.     On June 4, 2007, Castoro telephoned and angrily threatened that if I did not withdraw the State Court lawsuit that he would, "Sue [me] for millions of dollars and put [eBuy-Sell] out of business by freezing the account."

33.     eBuy-Sell was not a party to the State Court lawsuit.

34.     On June 6, 2007, ITEX froze my account. In an email, Castoro stated my account was "frozen do [sic] to pending litigation" (Exhibit 15).

35.     To date, my account remains frozen and ITEX has withheld the balance of $1,686.58 (Exhibit 16).

36.     ITEX's breaches of contracts with Mergent Services and eBuy-Sell and the freezing of eBuy-Sell's account and tortuous interference with eBuy-Sell's business relationships caused injury to both Mergent Services and eBuy-Sell. Mergent Services lost $580,000 in profits and eBuy-Sell lost in excess of $75,000 in profits.

37.     I am a customer to, and a customer of, 22,000 ITEX members. ITEX's freezing of my account prevented me from making sales to, and purchases from, 22,000 members. As a result, ITEX tortuously interfered with my

interstate business relationships.

**Conflicts of interest**

38.    In violation of ITEX's fiduciary duty to act in the best interests of its
members, ITEX causes conflicts of interest between its brokers (and their
employees) and its members.  The *Rules of the ITEX Marketplace*,
created by ITEX, state:

> "Brokers and their employees, both in the United
> States and Canada, are free to buy and sell in
> the Marketplace . . ." (Exhibit 17 at Exhibit G at
> para B. 3.20.)

The conflicts are obvious.  Brokers and their employees receive first
notice when goods and services become available.  Premium and more
desirable goods and services are "siphoned off" by brokers and their
employees before reaching members.

Charles Cruikshank, Esq., NYTO's Washington state attorney,
acknowledges that:

> "On some occasions, NYTO will
> purchases goods and services from ITEX
> members with intent to resell, without
> mark up, to other ITEX members."
> (Exhibit 38 para. #8)

Ian Olito, NYTO's former Vice President, states that Castoro "keeps
these [the more desirable goods and services] to himself and resells the
premium ones for cash."  As examples, Mr. Olito said that Castoro
withholds golf memberships in Bella Visa and Battleground Country
Clubs from ITEX members "and sells them for cash to his friends" and

estimates that Castoro "earns tax free about $40,000 per year for the last three years."

39.    In violation of ITEX's fiduciary duty to act in <u>my</u> best interests, White and Benson conspired to influence the outcome of arbitration <u>against my best interests</u> and in favor of their business associates – NYTO, Castoro, and Garcia.

The arbitration was conducted by the American Arbitration Association (Case No. 75 148 00320 09 GLO).  *White and Benson were not parties to the arbitration*.

On March 26, 2010, White secretly sent Lawrence R. Mills, Esq., the arbitrator, a letter with a check for $1,650 and offered an additional $55,000 to influence the outcome of the arbitration in favor of NYTO, and Castoro (Exhibit 18).

On April 3, 2010, the Arbitrator Mills advised the parties [that White's attempt to influence him] was "inappropriate", requested "ITEX Corporation to cease communication with the arbitrator", and returned the $1,650 check (Exhibit 19).

On April 6, 2010, Benson tried to cover up White's attempt to improperly influence the arbitrator.  Benson wrote the arbitrator claiming that White's March 26, 2010 letter to the arbitrator (*clearly from and signed by White*), the check for $1,650, and the offer of an additional $55,000 was, *unbelievably,* from Benson and *not from White* (Exhibit 20).

Subsequently, NYTO, Castoro, and Garcia withdrew from the arbitration.

## Count II
### Racketeer Influenced and Corrupt Organizations Act
### 18U.S.C. §§ 1961-68

40.     The court is respectfully referred to Plaintiffs' RICO Case Statement.

41.     The Plaintiffs' RICO Case Statement will be submitted on or before August 25, 2014.

## Count III
### Shareholder Derivative Action on behalf of ITEX
### (against White, Best, and Wade)

42.     This cause of action is brought on behalf of ITEX and against White, Best, Wade, and Benson (collectively, the "derivative defendants") to redress injuries suffered, and yet to be suffered, by ITEX as a direct and proximate result of the breaches of fiduciary duties, self-dealing, tunneling (the pilfering of ITEX's cash and shares), and other wrongdoing by White, Best, and Wade.

43.     I also allege a direct claim under SEC Rule 14a-7 as a result of the derivative defendants' failure to provide me with shareholder information

44.     I have been a continuous ITEX member since April 18, 2002 (Exhibit 2) and continuous shareholder since January 24, 2013 (Exhibit 21). I was a member and/or shareholder at the time of the events complained of herein.

45.     I am a non-controlling shareholder of ITEX who is proceeding

derivatively on behalf of ITEX and am the proper party to prosecute this lawsuit.

46. I state this action is not a collusive one to confer jurisdiction that the court would otherwise lack. I will adequately and fairly represent the interests of ITEX and its shareholders in enforcing ITEX's rights.

47. By reason of White, Best, and Wade' positions as officers, directors, and/or fiduciaries of ITEX, and because of their ability to control ITEX's business and corporate affairs, White, Best, and Wade owed ITEX and its shareholders fiduciary obligations that included candor, good faith, care, loyalty, compliance with applicable laws, and were and are required to use their utmost ability to control and manage ITEX in a fair, just, honest, and equitable manner. White, Best, and Wade were and are required to act in furtherance of the best interests of ITEX and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

**Background**

48. In 2000, the SEC settled fraud charges against Terry Neal ("Neal"), ITEX's then CEO. The SEC barred Neal from serving as an officer or director of a public company, ordered him to disgorge $2.3 million in ill-gotten gains and to pay a $200,000 civil penalty.

49. In 2002, White was hired as an ITEX consultant by Collins Christensen ("Christensen"), ITEX's then CEO. *Without authorization*, Christensen issued 250,000 shares of ITEX's stock to White in an

apparent attempt to convert these shares and gain 250,000 favorable votes in an upcoming shareholders' election.

50.   When ITEX's Board of Directors discovered Christensen's unauthorized award of 250,000 shares to White, Christensen was terminated.

51.   Christensen subsequently pleaded guilty in federal court to one count of wire fraud related to a scheme to embezzle nearly $1 million of investor funds.

52.   In January 2003, soon after Christensen was terminated, White and long-term business associates Best and Wade launched a hostile proxy battle for control of ITEX. On February 5, 2003, White, Best, and Wade were elected as Directors of ITEX.

53.   White appointed himself as ITEX's CEO, CFO, and Chairman of the Board of Directors and subsequently hired Benson, another long-time business associate, as Vice President. Within weeks, White, Best, and Wade used their control to oust ITEX's entire preexisting Board of Directors and, to date, have systematically looted ITEX through excessive compensation and self-dealing transactions.

54.   It appears there were no talent searches conducted to seek out the best qualified *independent* candidates for Director and Vice President position.

55.   *Without shareholder approval,* White "tunneled" the following additional shares of ITEX stock: 40,000 shares on March 15, 2004, 300,000 shares on May 3, 2004, 40,000 shares on January 10, 2005,

50,000 shares on December 13, 2005, 40,000 shares on January 9, 2006, 300,000 shares on July 6, 2006, 40,000 shares on January 8, 2007, 30,000 shares on January 4, 2008, 30,000 shares on December 19, 2008, 195,000 shares on October 8, 2009, and a presently unknown number of shares subsequent to October 8, 2009.

**Demand futility**

56.    Because White, Best, and Wade committed the wrongdoing alleged herein, they cannot reasonably be expected to initiate litigation on ITEX's behalf. Each derivative defendant played a central role in the breaches of fiduciary duty and faces a substantial likelihood of personal liability as a result of their actions and conscious failures to act. In fact, this would require them to pursue litigation against themselves.

**White, Best, and Wade are causing ITEX to
unlawfully conduct business in 47 states**

57.    ITEX's states its annual transactions are $250 million. ITEX is conducting business in all 50 states. With the exceptions of Nevada, California, and Washington, ITEX is unlawfully conducting business in the entire United States. ITEX does not have the authority to conduct business in 47 states (Exhibit 5). Seven of these states revoked ITEX's authority to do business in their state as a result of ITEX's evading payment of taxes and tax filings. In many states, ITEX has unlawfully conducted business for over 20 years.

58.     In the last 10 years alone, ITEX evaded the payment of taxes and

tax filings due to 47 states on an estimated **$2.35 billion** of its sales and

**$35,373,000** of its association fees.

59.     White's, Best's, and Wade's fiduciary breaches have exposed ITEX

and its shareholders to the possibility of enormous tax consequences

including late penalties, interest charges, related costs, *and criminal*

*prosecutions.*

60.     In NYS alone, corporations that "fail to file a return or report for three

consecutive taxable years shall be guilty of a *class E felony* (New York Law –

Part 2 - § 1809 *Corporate Taxes; Repeated Failure to File*).

61.     As a result of White's, Best's, and Wade's fiduciary breaches to comply with

federal, state, and local tax laws the late penalties, interest charges, and related

costs should come from *their* pockets and <u>*not from ITEX and its shareholders*</u>.

### 26 USC § 7201 – Attempt to evade or defeat tax

62.     White, Best, and Wade caused ITEX to violate 26 USC § 7201 which

states:

> "Any person who willfully attempts to evade or defeat any tax
> imposed by this title or the payment thereof shall, in addition
> to other penalties provided by law, be guilty of a felony and,
> upon conviction thereof, shall be fined not more than
> $100,000 ($500,000 in the case of a corporation), or
> imprisoned not more than 5 years, or both, together with the
> costs of prosecution."

### 18 USC § 371 – Conspiracy to defraud the United States

63.     White, Best, and Wade caused ITEX to violate 18 USC § 371 which states:

> "If two or more persons conspire either to commit any offense
> against the United States, or to defraud the United States, or

any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

## White, Best, and Wade are causing
## ITEX laundering unlawful income

64.     In the past decade, ITEX laundered an estimated $2.35 billion of its

sales and $35,373,000 of its association fees and defrauding the United

States by reporting on federal tax returns that this income was lawfully

obtained.

## White, Best, and Wade are causing ITEX to unlawfully operate
## as an unlicensed financial institution and money transmitter

65.     ITEX annually processes $250 million of the transactions of its

22,000 members.  Without the required federal or state licensing ITEX: a)

establishes and maintains an internal bank account for each of its 22,000

members, b) accepts deposits to and withdrawals from these accounts,

c) issues ITEX checks and provides checking, d) issues ITEX

MasterCard cards, e) issues ITEX debit cards, f) makes interest bearing

loans, g) charges monthly banking fees, h) provides monthly bank

statements, i) annually reports its members' sales to the IRS, and j)

performs other banking functions.

## White, Best, and Wade are causing ITEX
## to suppress shareholder democracy

66.     White, Best, and Wade violated their fiduciary duty to ITEX by

suppressing shareholder democracy of the elections and voting held on

May 14, 2012 and December 13, 2013.

67. On May 4, 2013, in accordance with SEC Rule 14a-7, I demanded that ITEX provide me with shareholders' contact information so that I could democratically participate and communicate with shareholders prior to the election of directors and the voting upon other matters held on December 13, 2013 (the "election") (Exhibit 22). ITEX is required to provide me with this information within five (5) business days (Exhibit 23). On July 17, 2014, I made a second request for shareholder information under SEC 14a-7 (Exhibit 24). To date, despite the passage of "five (5) business days", I have not received this information.

68. As a result, White, Best, and Wade are suppressing democratic participation in the elections.

**White, Best, and Wade "rigged" the May 14, 2012 and December 13, 2013 shareholder elections in favor of themselves**

69. White, Best, and Wade caused ITEX to engage in a series of corporate transactions designed to suppress shareholder democracy and rig, or attempted to rig, the outcome of the elections held on May 14, 2012 and December 13, 2013 in favor of themselves.

70. White, Best, and Wade were re-elected on May14, 2012 and December 13, 2013.

71. White, Best, and Wade apparently felt that ITEX would slip from their grip and consolidated their control over ITEX through a series of self-dealing corporate actions

72. *Without shareholder approval,* on March 25, 2011, White, Best, and Wade enacted what is known as a "poison pill," that obstructs

shareholder democracy by preventing of shareholder groups from accumulating more than 15% of ITEX's shares.

73.    In addition, *without shareholder approval*, White, Best, and Wade executed the following self-dealing transactions within a 24-hour period to rig, or attempt to rig, the shareholders' elections by assuring that 346,000 additional and new shares would be voted in their favor (Exhibit 39):

    a)    On March 30, 2011, in a conflict-of-interest, White, Best, and Wade, ITEX's entire Board of Directors, caused ITEX to sell 151,000 shares to 19 persons within the ITEX Broker Network for the discounted price of $4 per share. As a significant term of the transaction, the shares had to "be voted in accordance with the recommendations of the Board of Directors and an irrevocable proxy be given to the corporate secretary of ITEX" (emphasis added).

    These 19 persons were not even required to pay cash because these shares would be voted as White, Best, and Wade directed. It is unlikely that White, Best, and Wade performed credit checks to determine the ability of these persons to pay for these shares.

    b)    On March 30, 2011, *without shareholder approval*, White, Best, and Wade awarded themselves an

additional 195,000 shares. In addition to White's inflated salary, expense account, generous bonuses, substantial amount of shares already awarded to him, White tunneled 190,000 of the 195,000 shares to himself and 5,000 shares to Wade. This allowed White to line his pockets with over $800,000, Wade to line his pockets with over $20,000, dilute the shares of independent shareholders, and rig the elections by assuring himself of 195,000 additional votes.

74.     On April 5, 2011, White, Best, and Wade afforded themselves the discretion to buy off shareholders. White, Best, and Wade repurchased 92,000 shares at the premium price of $4.50 per share (despite having sold shares at the discount price of $4.00 six days earlier). This was a targeted repurchase of shares to eliminate 92,000 votes White, Best, and Wade expected would be voted against them.

75.     Instead of promoting shareholder democracy, White, Best, and Wade, who have a long history of shared business dealings with each other prior to, and outside of, ITEX, chose to entrench their position within ITEX and ensure that it is unreasonably difficult for any shareholder who disagrees with their policies to obtain any control.

76.     White, Best, and Wade' business dealings include White serving as a past director of Morse Best, a company founded by Best. Best is the

CEO of Mercent Corp., a company that employs Wade as its Finance Director.

77. Institutional Shareholder Services ("ISS"), the nation's preeminent proxy advisory firm, considers Best an "affiliated outsider" and disputed that Wade was independent (Exhibit 25).

78. White, Best, and Wade have taken every opportunity to enrich themselves at ITEX's expense, consistently rewarding and entrenching themselves. White rewards those close to him with ITEX's funds, including appointing his son to a position working for one of ITEX's brokers. The appointment of White's son was not disclosed in ITEX's public filings.

79. Between 2005 and 2007, White and Wade caused ITEX to pay Best $100,000 for "consulting services" at a time when Best's company (Morse Best) was struggling. There was no competitive bidding for these consulting services, no apparent need for these consulting services, and no demonstrable results of Best's consulting services.

80. In 2011, Best and Wade, *without shareholder approval*, increased White's compensation from $428,093 to $1,068,480 for performing the duties of CEO and ***CFO*** (Exhibit 40).

81. On November 12, 2012, White hired Wade, White's long-term business associate, an ITEX Director, and a defendant in this action, as ITEX's part-time CFO. Wade's annual *part-time* salary for performing as CFO is $106,600 plus cash and stock bonuses (Exhibit 41).

82. Despite White's CFO duties being transferred to Wade. No reduction was made to either White's salary or compensation.

83. It appears a talent search was not conducted to locate and hire the best qualified person for the CFO position.

**White, Best, and Wade are causing ITEX to defraud its shareholders, brokers, and members**

84. ITEX is defrauding its shareholders, 97 brokers, and 22,000 members throughout the United States, Canada, and Panama by concealing from them that ITEX is unlawfully conducting business in 47 states (Exhibit 5).

**Demand for an accounting**

85. On behalf of ITEX, its shareholders, and myself, I demand an accounting from 2003 to date to the fullest extent permitted by New York Business Corporation Law – Article 6 - § 624, *Books and Records; Right of Inspection*, which states:

> (a)    Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its shareholders, board and executive committee, if any, and shall keep at the office of the corporation in this state or at the office of its transfer agent or registrar in this state, a record containing the names and addresses of all shareholders, the number and class of shares held by each and the dates when they respectively became the owners of record thereof. Any of the foregoing books, minutes or records may be in written form or in any other form capable of being converted into written form within a reasonable time.

> (b) Any person who shall have been a shareholder of of a corporation upon at least five days' written demand shall have the right to examine in person or by agent or attorney, during usual business hours, its minutes of the

proceedings of its shareholders and record of shareholders and to make extracts therefrom for any purpose reasonably related to such person's interest as a shareholder.

86.    The accounting should include all compensations, profits, loans, gifts, awards of shares, and all other gains received by White, Best, and Wade as a result of being a Director of ITEX from 2003 to the present, including reimbursed expenses.

**Demand for the settlement reached on behalf of ITEX and its shareholders**

87.    David Polonitza, an ITEX shareholder, filed a derivative action against White, Best, and Wade (*David Polonitza v. Steven White, Eric Best, and John Wade,* Superior Court of the State of Washington for King County, No. 11-2-30760-3 SEA) (the "Polonitza action").

88.    On December 28, 2012, a settlement was reached between the parties in the Polonitza action on behalf of ITEX and its shareholders. White, Best, and Wade have concealed the terms of the settlement.

89.    On behalf of ITEX, its shareholders, and myself, I demand that shareholders, including myself, be provided with a copy of that settlement.

**White and Benson breached their fiduciary duty to ITEX and its shareholders by conspiring and embezzling ITEX's funds to influence an arbitration**

90.    In 2009, I commenced an arbitration against defendants NYTO, Castoro, and Garcia (AAA Case No. 75 148 00320 09 GLO).  White and Benson are long-term business associates of NYTO, Castoro, and Garcia ("White's business associates").  The arbitration was

subsequently suspended because NYTO, Castoro, and Garcia refused to pay their portion of the costs of arbitration.

91.    *ITEX, White, and Benson were not parties in the arbitration.*

92.    White attempted to improperly influence the arbitration with ITEX's funds. On March 26, 2010, *White, who was not party to the arbitration*, sent the arbitrator a letter, an ITEX check for $1,650, with an additional offer of $55,000 (Exhibit 18) in an attempt to influence the arbitration in favor of White's business associates.

93.    On April 3, 2010, the arbitrator stated White's conduct was "inappropriate", requested "ITEX Corporation to cease communication with the arbitrator", and returned the $1,650 (Exhibit 19).

94.    On April 6, 2010, Benson, *who was not a party to the arbitration*, attempted to cover up for White's attempt to influence the arbitrator and offer of ITEX's funds. Benson wrote the arbitrator suggesting that White's March 26, 2010 letter, *clearly signed by White*, and White's forwarding the $1,650 ITEX check to the arbitrator with an offer of an additional $55,000, was somehow not from White *but from Benson* (Exhibit 20).

95.    White's taking of $1,650 of ITEX's funds and offer of an additional $55,000 of ITEX's funds *without shareholder approval* to influence the arbitration in favor of his business associates was embezzlement.

**White, Best, and Wade are causing**
**ITEX to violate an order of the SEC**

96.    On February 4, 2000, one of the SEC prosecutions against ITEX was

settled. The SEC permanently enjoined ITEX from, *inter alia,* defrauding investors "by designating the value of many ITEX's assets and transactions in 'trade dollars' rather than their far lower U.S.-dollar fair market values on its financial statements" and stated "the goods and services exchanged were grossly overvalued" (*SEC v. ITEX Corporation, et al.* (CV 99-1361 BR).

97.     It appears that ITEX is again inflating, or allowing to be inflated, the value of goods and services exchanged through ITEX's marketplace.

98.     On December 1, 2011, Sandy Sanford of San Diego Gems stated:

> "Perhaps my input will be of help." "Attempts have been made to speak with Steve White re unfair and unscrupulous business practices . . . to no avail" "ITEX froze my account because I dared to tell the truth to a member."

On December 15, 2011, Mr. Sanford stated:

> "ITEX is pushing a diamond and gold (10k) cross for $2,000 ITEX ...... I blew up. We are jewelry & diamond wholesalers. I can get crosses like this for $125. They would retail in stores for $200 to $300 and ITEX is asking $2,000.00??????" "This happens every day . . .. Isn't there something that can be done to control the markup on ITEX? The buyer is being taken to the cleaners."

99.     On February 20, 2012, Frances Kiperman stated that ITEX was engaged in price gouging. Specifically, Vera Wang sunglasses that regularly sell for $128 was being promoted by ITEX for $275.

100.     On March 9, 2014, Len Shapiro advised me that ITEX promoted services "at a grossly inflated cost."

**White, Best, and Wade have caused ITEX to
conduct unlawful interstate gambling operations**

101.    On February 7 and 11, 2011, ITEX emailed at least 669 of its members in

NYS, New Jersey ("NJ"), and other states to promote an "ITEX Texas Holdem

Tournament" held at Fire & Ice in NJ on February 17, 2011.

102.    On May 10, 2011, June 1, 2011, and June 7, 2011, ITEX emailed at least

669 its members in NYS, NJ, and other states on each of these days to promote

an "ITEX Hold-Em Poker Tournament" held at Fire & Ice in NJ on June 9, 2011.

103.    On February 1, 2012, ITEX emailed at least 669 its members in NYS, NJ,

and other states, including Patricia Adams, to promote interstate gambling on

Super Bowl XLVI that was held on February 5, 2012.

104.    Patricia Adams was not a winner of the Super Bowl XLVI gambling and two

unlawful debts of $250 each ($500) plus a cut of approximately 10% of her $500

loss was deducted from her account.

105.    Other unlawful debts deducted from members' account will be learned

through the discovery process.

106.    White, Best, and Wade caused ITEX to launder the unlawful debts of this

interstate gambling operation by reporting on federal, state, and local tax returns

that these funds were obtained legally.

**Count IV
Violations of Constitutional and Civil Rights
   (against ITEX, NYTO, Castoro, and Garcia)**

**ITEX and NYTO violated my Civil Rights**

107. ITEX, NYTO, Castoro, and Garcia (the "defendants") violated New York Civil Rights – Article 2 § 10, *Justice to Be Administered without Favor and Speedily* (the "Civil Rights Law"). In relevant part, the Civil Rights Law states:

> "Justice to be administered without favor and **speedily**. Neither justice nor right should be sold to any person, nor denied, nor deferred." (emphasis added)

108. I filed the State Court lawsuit on May 25, 2007. On March 26, 2013, nearly six years later, the complaint was dismissed (Exhibit 14). The dismissal was not based on the merits of the complaint.

109. Despite the passage of six years, seven of the eight defendants did not answer the complaint and no discovery was conducted.

110. The six-year delay was caused by the defendants' bad faith submissions to the State Court of a special proceeding to compel arbitration and a fraudulent "alleged" contract that contained an arbitration clause.

111. The defendants knew, or should have known, their status as an *unauthorized foreign corporation* prohibited them from submitting a special proceeding to compel arbitration and that the alleged contract was fraudulent.

112. *Firstly*, the defendants caused a six-year delay by concealing from the State Court that they are *unauthorized foreign corporations* unlawfully conducting business in NYS and are prohibited from filing a special proceeding to compel arbitration.

New York Business Corporation Law ("BCL") § 1312, *Actions or Special Proceedings by Unauthorized Foreign Corporations*, in relevant part, states:

> "(a) A foreign corporation doing business in this state without authority **shall not maintain any action or special proceeding in this state.**" (emphasis added)

On December 29, 1999 the NYS Department of State ("DOS") annulled ITEX's authority to do business in NYS as a *domestic* corporation (Exhibit 6) for evading payment of taxes and tax filings and on June 26, 2002 annulled ITEX's authority to do business in NYS as a *foreign* corporation (Exhibit 7) for evading taxes and tax filings. Despite both annulments, ITEX has continued robust business activities in NYS.

NYTO never obtained the required authority from DOS to do business in NYS (Exhibit 8). Despite not having the authority, to date, NYTO has continued doing robust business activities in NYS since 1999 and continually evaded payment of taxes and tax filings.

113. *Secondly,* the defendants caused a six-year delay by misleading the State Court by repeatedly asserting an "alleged" contract (Exhibit 17 at Exhibit E) submitted by them was valid.

Unfortunately, the State Court relied upon the alleged contract as the authority to compel arbitration. In 2009, I commenced an arbitration that was conducted by the American Arbitration Association. Subsequently, the arbitration was suspended as a result of NYTO's, Castoro's, and Garcia's refusal to pay their share of the arbitration fees.

The defendants knew, or should have known, the alleged contract they submitted to the State Court was fraudulent and their submission of it was misleading and would cause delay:

a) I never saw the alleged contract before ITEX submitted it to the State Court and, therefore, could not have agreed to it.

b) The alleged contract, by its own terms, is *invalid*. As a significant term, it states the "agreement between the parties" must be "signed by both parties" (Exhibit 17at Exhibit E para. #8).

The alleged contract was never agreed to, never signed, and never dated by an "Authorized agent of ITEX" as required. It was never agreed to, never signed, and never dated by me as required. Therefore, *by its own terms*, the alleged contract is *invalid*.

c) Defendant Benson admitted the "UPDATED: May 17, 2002" date printed on the alleged contract (Exhibit 17at Exhibit E, last page) is *erroneous* and the date the alleged contract was actually created is unknown. Benson guessed the alleged contract was created "sometime in early 2004" (Exhibit 17at Exhibit E, para. #16).

Therefore, the effective date, a critical element of any contract, is *ambiguous*.

The alleged contract was written and drafted entirely by ITEX. All ambiguities go against the drafter.

Under New York law "the initial interpretation of a contract 'is a matter of law for the court to decide.'" *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (quoting *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir. 1996)); see also *Curry Rd. Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir. 1990) ("Whether a contract is ambiguous is a question of law."). A court should construe a contract as a matter of law only if the contract is unambiguous on its face. See *Metro. Life Ins. Co. v. RJR Nabisco Inc.,* 906 F.2d 884, 889 (2d Cir. 1990). A contract is unambiguous if it "has 'a definite precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.,* 385 N.E.2d 1280, 1282 (N.Y. 1978)); see also *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 109 (2d Cir. 1993); *Metro. Life Ins. Co.*, 906 F.2d at 889. Where the contractual language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of the proper interpretation should be submitted to the trier of fact. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993); *Abner, Herrman & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331, 336 (S.D.N.Y. 2004).

d) Even if an "Authorized agent of ITEX" and I signed and dated the alleged contract, it would be void due to fraud. ITEX concealed that it is unauthorized to do business 47 states, including NYS.

It is well settled in New York that "a misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud".

**NYTO, Castoro, and Garcia maliciously filed a motion for a temporary restraining order and preliminary injunction to chill my speech rights and to tortuously interfere with my interstate business relationships**

114.    An occurrence during the State Court lawsuit was NYTO's, Castoro's, and Garcia's (the "defendants") request for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"). On March 13, 2012, the defendants maliciously filed a motion for a TRO and PI to chill my speech rights.

115.    I am an ITEX member. ITEX's 22,000 members are my customers. I am also a customer to these 22,000 members. Each member is a business separate and independent from ITEX.

116.    The defendants filed a TRO and PI to chill my First Amendment speech rights in an effort to tortuously interfere with my business relationships with 22,000 ITEX members.

117.    The defendants lacked probable cause and a substantial basis in law. The prosecution of their TRO and PI was for the purpose of

harassing, intimidating, punishing, or otherwise maliciously inhibiting my speech and associational rights.

118.    At first opportunity, the State Court disposed of the defendants' frivolous claims.

119.    On March 26, 2013, the State Court denied the defendants motion for a TRO and PI and stated:

> "Movants [the defendants] have asserted no claim by way of any complaint or counterclaim by them against plaintiff, and they therefore cannot show that they are likely to prevail on such claim." (Exhibit 35)

120.    The defendants' proceeding for a TRO and PI terminated in my favor. To succeed on a claim for malicious prosecution, a plaintiff must show that the defendant initiated a proceeding that terminated in favor of the plaintiff. See *Engel v. CBS*, 93 NY2d 195, 204 [1999]; See *Black v. Green Harbour Homeowners' Assn.*, 37 AD3d 1013, 1014 [2007]; See also *I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 AD3d 206, 207 [2005]).

121.    It has been long established that infringements on speech rights "are the most serious and the least tolerable infringement on First Amendment rights." See *Nebraska Press Assn. v. Stuart*, 427 US 539, 559 [1976]; See also *Whitney v. California*, 274 US 357, 376 [1927, Brandeis, J., concurring] ["(to) justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced"]) and a party seeking to obtain such a restraint

bears a correspondingly heavy burden of demonstrating justification for

its imposition (*Organization for a Better Austin v. Keefe*, 402 US 415, 419

[1971]; *Near v. Minnesota ex rel. Olson*, 283 US 697, 713 [1931]).

**ITEX violated my rights under the First, Fifth, and
Fourteenth Amendments to the United States Constitution
by "sewer serving" a Notice of Entry**

122.    An occurrence during the State Court lawsuit was ITEX's "sewer

service" of a Notice of Entry.

123.    On November 15, 2007, I notified the State Court and all the parties,

including Cameron Myler, Esq. ("ITEX's attorney"), that I would be out-of-

the-country and unavailable from November 19, 2007 to March 15, 2008

(Exhibit 36).

124.    During January and February 2008, while I was out-of-the-country,

ITEX's attorney and I were communicating by email and discussing a

possible settlement.

125.    On February 1, 2008, ITEX's attorney emailed a January 14, 2008

(misdated January 14, 200**7**) decision of the State Court that granted

ITEX's special proceeding to compel arbitration and dismissed my

complaint.  Importantly, the decision was twice stamped:

> "UNFILED JUDGMENT
> This judgment has not been entered by the
> Country Clerk and notice of entry cannot be served
> based hereon." (Exhibit 37).

126.    As intended, ITEX misled me into believing the Notice of Entry was

not filed.

127.    Upon returning to New York on March 15, 2008, I discovered that
        ITEX deceived me. Despite regularly communicating with ITEX by email
        and providing ITEX with my email address for the service of papers, ITEX
        served the Notice of Entry by mailing it to my New York address and,
        knowing that I was out-of-the-country, <u>did not serve or notify me by email</u>.

128.    This, in effect, was *sewer service.*

129.    The Notice of Entry was mailed to my New York address on February
        6, 2008. By the time I returned to New York on March 15, 2008 more
        than thirty days passed and, as ITEX intended, <u>I was precluded from
        both rearguing the State Court's decision *and* appealing it to the
        Appellate Division</u>.

130.    The constitutional guarantee of due process of law, found in the Fifth and
        Fourteenth Amendments to the U.S. Constitution, interpreted to include
        protection under the Bill of Rights, prohibit arbitrarily or unfairly depriving
        individuals of their basic constitutional rights to life, liberty, and the pursuit of
        happiness.

        ITEX violated the Fifth and Fourteenth Amendments by arbitrarily
        and unfairly depriving me of basic constitutional rights to life, liberty, and
        the pursuit of happiness.

131.    The right to sue and defend in the courts is one of the highest and
        most essential privileges of citizenship. See *Chambers v. Baltimore &
        O.R.R.*, 207 U.S. 142, 148 (1907); *McKnett v. St. Louis & S.F. Ry.*, 292
        U.S. 230, 233 (1934).

- 34 -

ITEX's sewer service of the Notice of Appeal deprived me of the "highest and most essential privileges of citizenship", "The right to sue and defend in the courts."

132.    The right to petition the courts is protected by the First Amendment. See *California Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

ITEX deprived my right under the First Amendment to petition the State Court and NYS Supreme Court, Appellate Division, First Department ("Appellate Division").

I affirm the above is true and correct to the best of my knowledge.

Dated:  August 11, 2014

John Andries Bal, Jr., Agent
Plaintiff *pro se*
85 Kenmare Street #35
New York, New York 10012
(212) 966-7576
email: MERGENTserv@msn.com



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### Pro Se Intake Unit

*SCANNED*

**To:**     The Honorable <u>Judge Colleen McMahon</u>

**From:**   <u>S. Coretto,</u> Pro Se Intake Clerk, Docket Services, Ext. <u>1177</u>

**Date:**    <u>8/12/2014</u>

### Re: Bal v. ITEX Corporation et al     1:13-cv-06794-CM

     The attached document, which was received by this Office on <u>8/11/2014,</u> has been submitted to the Court for filing. The document is deficient as indicated below. Instead of docketing the document for public access, it has been docketed as a court-view only docket entry. I am forwarding it to you for your consideration. See Fed. R. Civ. P. 5(d)(2)(B), (4).

(   )     No original signature.

(   )     No Affirmation of Service/ Proof of Service.

( X )     **Other:** <u>Pro Se Plaintiff appears to introduce additional plaintiffs as corporations on his caption.</u> <u>Please advise as to whether accept filing or return. Corporations can not appear Pro Se.</u>

     If you memo-endorse the filing, you do not need to return this memorandum to the Pro Se Office. Once your memo-endorsement is docketed and filed, all ECF users on the case will be notified.

     In the alternative, please return this memorandum with the attached papers to this Office, indicating at the bottom what action should be taken.

( ✓ )    **ACCEPT FOR FILING**          (   )    **RETURN TO *PRO SE* LITIGANT**

Comments:

_____

_____

_____

United States District Judge

Dated: 8/12/14

_____

United States Magistrate Judge

Dated: