UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
U.S. COURTHOUSE - 500 PEARL STREET
NEW YORK, N.Y. 10007

RECEIVED
SEP - 8 2014
PRO SE OFFICE

Business Watchdog

Case # 13-6794 (CM)

against

ITEX Corporation

Document: Plaintiffs'
RICO
Case Statement

I submit this Plaintiffs' RICO Case Statement in response to the Defendants' Motion to Dismiss the Complaint, in part, because Plaintiffs did not submit this RICO Case Statement.

John Boal
Plaintiff pro se

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x     13 Civ. 6794 (CM)

BUSINESS WATCHDOG, MERGENT            :
SERVICES, and JOHN ANDRIES BAL, JR.,
                                      :
                    Plaintiffs,
                                      :
          -v-
                                      :
ITEX CORPORATION, STEVEN WHITE,                **PLAINTIFFS'**
personally and in the capacity of CEO, CFO,   :    **RICO CASE**
and Chairman of the Board, ERIC BEST,              **STATEMENT**
personally and in the capacity of Director,   :
JOHN WADE, personally and in the capacity
of Director, ROBERT BENSON, personally        :
and in the capacity of Vice President, NYTO
TRADE INCORPORATED, JOHN CASTORO  :
aka NYTO TRADE INCORPORATION aka
NYTO TRADING CORPORATION aka NYTO  :
TRADE EXCHANGE and 44 TRADE
CORPORATION, aka NYTO TRADE, INC.,            :
personally and in the capacity of President,
and IZZY GARCIA, personally and in the        :
capacity of Manager,
                                      :
                    Defendants.
                                      :
------------------------------------------------------------x


     Plaintiff JOHN ANDRIES BAL, JR. ("Bal") is the owner of Mergent
Services, a sole proprietorship, founder of Business Watchdog, a consumer
advocacy organization (collectively, the "plaintiffs"), and is acting in the capacity
of *Private Attorney General.* Bal is also a shareholder and member of ITEX
Corporation ("ITEX"). Plaintiffs submit the allegations herein upon information
and belief.

     The RICO defendants are Steven White ("White"), CEO, CFO, and
Chairman of the Board of Directors of ITEX, Eric Best ("Best"), Director of ITEX,
John Wade ("Wade"), Director of ITEX, Robert Benson ("Benson"), Vice
President of ITEX, as Directors and an Officer they exercise control over ITEX,
NYTO Trade Incorporated ("NYTO"), John Castoro ("Castoro"), President of
NYTO, and Izzy Garcia ("Garcia"), Manager of NYTO (collectively, "the RICO
defendants").

ITEX is an entity separate from the RICO defendants. The RICO defendants participate in lawful conduct on behalf of the corporation and, collectively, unlawful conduct on their own behalf as an association-in- fact criminal enterprise ("enterprise"). The lawful conduct of the RICO defendants is intended to provide an ongoing appearance of legitimacy. The RICO defendants' unlawful conduct is intended to provide an on-going source of substantial illicit financial gain. Some of the illicit financial gain is reinvested into the enterprise and invested in, and to control, interstate and foreign businesses. These illicit financial gains are also funneled to the RICO defendants as awards of ITEX's shares, incentive compensation, bonuses, salaries, commissions, and distributions.

The allegations in the amended complaint are supported by a substantial amount of evidence already in plaintiffs' possession. However, plaintiffs expect that additional relevant evidence presently in the hands of the RICO defendants will become available through discovery and respectfully reserve the right to amend Plaintiffs' RICO Case Statement.

## Background

ITEX is a Nevada corporation with its principle office located in Bellevue, Washington. Past and present executives of ITEX have an established pattern of wrongdoing beginning in 1999, existing today, and a likelihood of continuing into the future.

On September 27, 1999, the Securities and Exchange Commission ("SEC") filed multiple fraud charges against ITEX's then CEO Terry Neal ("Neal"), ITEX's accountant, and several ITEX executives (Exhibit 1). The SEC's prosecutions resulted in settlements. Subsequently, on December 27, 2002, Neal and Eric Whitmeyer, Neal's attorney, were arrested on a criminal arrest warrant signed by Judge John Jelderks of the United States District Court for the District of Oregon. On April 13, 2004, Neal pleaded guilty to defrauding the United States government and received a 19-month jail sentence.

In 2002, a few months prior to White's becoming ITEX's CEO, CFO, and Chairman of its Board of Directors, White was a business associate of ITEX's then CEO Collins "Collie" Max Christensen ("Christensen"), a convicted white-collar felon. In an apparent theft of 250,000 shares of ITEX's stock and to gain votes at an upcoming shareholders' election, *without authorization*, Christensen transferred 250,000 shares to White. Upon discovering this theft ITEX's Directors terminated Christensen.

## White, Best, and Wade seized control of ITEX

Shortly after Christensen was terminated, White and long-term business associates Best and Wade launched a successful hostile proxy battle for the control of ITEX. On February 5, 2003, White, Best, and Wade were elected as

Directors. Thereafter, White appointed himself the CEO, CFO, and Chairman of the Board of Directors. To retaliate for terminating Christensen and to gain absolute control of ITEX White, Best, and Wade terminated ITEX's entire Board of Directors and top level executives. Subsequently, White hired Benson, another long-term business associate, as ITEX's Vice President.

**White, Best, and Wade rigged the May 14, 2012 and December 13, 2013 shareholders' elections to assure themselves continued control of ITEX**

*Without shareholder approval*, White, Best, and Wade executed self-dealing transactions within a 24-hour period to rig, and attempt to rig, the shareholders' elections of May 14, 2012 and December 13, 2013 by assuring that 346,000 additional and new shares would be voted in their favor.

On March 30, 2011, *without shareholder approval,* White, Best, and Wade (who constituted ITEX's entire Board of Directors) caused ITEX to sell 151,000 shares of stock that cost $604,000 to 19 persons (which averaged $31,789.47 per person) within the ITEX Broker Network for the discounted price of $4 per share. As a significant term of the transaction, the shares had to "be voted in accordance with the recommendations of the Board of Directors [White, Best, and Wade] and an irrevocable proxy be given to the corporate secretary of ITEX" (emphasis added) (Exhibit 2). Because the 151,000 shares would be voted as White, Best, and Wade directed, these 19 persons were not required to either pay cash or undergo a credit check to determine their ability to pay $604,000 for the shares.

On March 30, 2011, *without shareholder approval*, White and Wade awarded themselves 195,000 shares (at $4.25 per share) of ITEX's stock. In addition to White's inflated salary, expense account, generous bonuses, substantial amount of shares already awarded to him, White tunneled 190,000 of the 195,000 shares to himself and, as an apparent gratuity, 5,000 shares to Wade (Exhibit 2). This allowed White to line his pockets with $807,500 worth of shares, Wade to line his pockets with $21,250 worth of shares, dilute the shares of independent shareholders, and rig the elections by assuring himself of 195,000 additional votes.

**Business Watchdog gave fair warning to the RICO defendants**

About February 19, 2012, Business Watchdog cited several of the predicate offenses listed below and warned the RICO defendants they "may be violating the Racketeer Influenced and Corrupt Organizations Act [RICO]" through "a pattern of 'racketeering activity'" (Exhibit 3). The RICO defendants allowed or encouraged the alleged predicate offenses to continue.

As long as RICO defendants White, Best, Wade, and Benson remain, respectively, Directors and Vice President of ITEX, they will receive conditional pro bono legal representation. This may constitute either bribery, extortion, or a fraudulent inducement to keep the RICO defendants from independently seeking legal representation.

The following list includes co-conspirators not named as defendants. It also does not include other co-conspirators and aiders and abettors that may be identified through discovery.

## RICO Predicate Offenses

1. **State whether the alleged unlawful conduct is in violation of 18 USC §§ 1962(a), (b), (c), and/or (d).**

   The alleged unlawful conduct is in violation of 18 USC § 1962(a), (b), (c), and (d).

2. **List each defendant and state the alleged misconduct and basis of liability of each defendant.**

   White, Best, Wade, Benson, NYTO, Castoro, and Garcia participated and conspired to participate in the predicates acts that form the pattern of racketeering alleged below.

3. **List the alleged victims and state how each victim was allegedly injured.**

   ITEX is doing business in all 50 states of the United States, Canada, and Panama. At least since 2003, to date, and likely continuing into the future, the RICO defendants knowingly cause <u>ITEX to unlawfully do business in 47 states</u>. Seven states revoked ITEX's authority to do business in their state for evading taxes and tax filings and 40 states have no record of ITEX receiving the authority to do business in their state (Exhibit 4). The RICO defendants fraudulently conceal that ITEX is not authorized to do business in these 47 states as a racketeering scheme to continue selling memberships and brokerships and to continue collecting substantial commissions and association fees from 9,070[1] members

---

1 Alabama (353 members), Alaska (3), Arizona (162), Arkansas (16), Colorado (152), Connecticut (291), Delaware (1), Florida (1,300), Georgia (326), Hawaii (12), Idaho (134), Iowa (26), Illinois (393), Indiana (360), Kansas (20), Kentucky (353), Louisiana (19), Massachusetts (181), Maine (17), Maryland (20), Michigan (99), Minnesota (407), Mississippi (11), Missouri (98), Montana (9), Nebraska (325), New Hampshire (62), New Jersey (319), New Mexico (55), New York (350), North Carolina (407), North Dakota (2), Ohio (542), Oklahoma (291), Oregon (316), Pennsylvania (188), Rhode Island (8),

within these states and 12,930 members outside of the 47 states. *Selling memberships and brokerships in states that ITEX is not authorized to do business is the equivalent of a con artist selling the rights to the Brooklyn Bridge.*

In addition, the RICO defendants cause ITEX to systemically embezzle funds from its members, conduct unlawful interstate gambling activities, and collect unlawful debts. These embezzlements and collection of unlawful debts are recorded in the accounts of ITEX members.

ITEX publically states that it transacts over $250 million of business annually. ITEX has been unlawfully doing business in most of these 47 states for over 20 years. In the past decade alone, *excluding unlawful sales of brokerships and memberships, systemic embezzlements, and collection of unlawful debts*, the RICO defendants caused ITEX to conceal, launder, and evade taxes and tax filings on an estimated **$2.35 billion** of its sales, **$35,373,000** of association fees, and additional millions of dollars in the sales of brokerships and memberships.

The RICO defendants caused ITEX to victimize following persons:

a) Mergent Services' business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to continually use U.S. Mail and interstate wires to transact and fraudulently deceive Mergent Services by concealing that ITEX is not authorized to do business in 47 states and to unlawfully embezzle Mergent Services' funds on the following dates and methods: 1) the theft of a $395 membership fee as a result of U.S. Mail sent to Bal on February 21 2002 (Exhibit 5), April 6, 2002 (Exhibit 6), and April 20, 2002 (Exhibit 7); 2) under the pretext of selling advertising, the embezzlement of $24,720 on December 26, 2002 (Exhibit 8) and $25,750 on November 21, 2003 (Exhibit 9) by the use of interstate wires. This victimization caused Mergent Services to lose $580,000 in profits to September 2014 and continuing. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed a separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

Benson conspired with the RICO defendants by: 1) submitting a fraudulent accounting statement to the NYS Supreme Court in an attempt to conceal ITEX's embezzlement of $24,720 of Bal's funds on December 26, 2002, 2) creating ITEX's Spend Down status as a

---

South Carolina (44), South Dakota (1), Tennessee (187), Texas (678), Utah (397), Vermont (12), Virginia (63), West Virginia (1), Wisconsin (56), and Wyoming (3).

method to systemically embezzle funds from ITEX members, and 3) attempting to improperly influence an American Arbitration Association arbitration against Bal and in favor of NYTO, Castoro, and Garcia.

b) eBuy-Sell's business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to continually use U.S. Mail and interstate wires to transact and fraudulently deceive eBuy-Sell by concealing that ITEX is not authorized to do business in 47 states and to embezzle eBuy-Sell's funds on the following dates and methods: 1) under the pretext of selling advertising, the embezzlement of $6,180 on December 13, 2004 by the use of interstate wires (Exhibit 10); 2) under the pretext of selling Onyx restaurant gift certificates, the embezzlement of $700 in April 2007 by the use of U.S. Mail and interstate wires; and 3) the embezzlement of a $472 refund from Manhattan Mini Storage on September 10, 2008 by use of interstate wires. The RICO defendants subsequently caused ITEX to launder these funds. This victimization caused eBuy-Sell to lose profits in excess of $75,000 to September 2014 and continuing. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed a separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

c) eBuy-Sell's business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of extortion, wire fraud, and money laundering. The RICO defendants caused ITEX to use interstate wires to transact and extort $1,686.58 from eBuy-Sell's account. On May 25, 2007, Bal filed a lawsuit in the New York State Supreme Court – New York County against ITEX, NYTO, Castoro, Garcia, et al. that, among other claims, sought the return of $56,650 embezzled from Bal's Mergent Services and eBuy-Sell accounts (*Mergent Services and John Bal v. ITEX Corporation, NYTO Trade Incorporation, John Castoro, Izzy Garcia, et al.*, Index No. 601777/2007) ("State Court" or "State Court lawsuit")[2].

On June 4, 2007, ten days after Bal filed the State Court lawsuit, Castoro telephoned Bal and angrily threatened that if Bal did not

---

2 There is also a *Qui Tam* action for NYS tax evasion pending in the NYS Supreme Court, New York Country, against ITEX, ITEX's Board of Directors, NYTO, NYTO's Board of Directors, Castoro, and Garcia and a separate cause of action against Debra A. James, personally and in the capacity of judge within the NYS Supreme Court (*Business Watchdog, et al. v. ITEX Corporation, et al.*, Index No. 400879/2013).

withdraw the State Court lawsuit that Castoro would, "Sue [Bal] for millions of dollars and put [eBuy-Sell] out of business by freezing the account." Bal has an intangible property right to the State Court lawsuit. Castoro instilled fear in Bal by threatening that if the State Court lawsuit was not withdrawn Castoro would cause ITEX to damage Bal's business, engage in other conduct constituting a crime, and perform acts that are calculated to harm Bal's business, calling, career, and financial condition.

Bal declined to withdraw the State Court lawsuit because ITEX refused to return his funds. On June 6, 2007, Castoro caused ITEX to freeze eBuy-Sell's account. In an email, Castoro stated eBuy-Sell's account was "frozen do [sic] to pending litigation" (Exhibit 11). As ITEX and Castoro intended, the extortionate freezing of eBuy-Sell's account and the conversion of eBuy-Sell's account balance (Exhibit 21) instantly put eBuy-Sell out of business. *This is the modern day equivalent of burning eBuy-Sell's business to the ground!*

To date, eBuy-Sell's account remains frozen and its account balance converted. Notably, eBuy-Sell was not a party to the State Court lawsuit. Castoro knew that Bal was the owner of eBuy-Sell and took these actions to injure Bal personally and in his business.

Castoro's and ITEX's conduct meet the threshold for the predicate act of extortion in violation of 18 USC § 1961(1) which states:

> "racketeering activity" means (A) any act or threat involving . . . extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year."

New York Penal Law ("PL") § 155.40, *Grand larceny in the second degree*, which includes extortion, is a class C felony and punishable by imprisonment for a minimum of one year, states:

> "A person is guilty of grand larceny in the second degree when he steals property and when:
> (2) The property, regardless of its nature and value, is obtained by extortion."

PL § 155.05 defines extortion as:

> "(e) By extortion. A person obtains property by extortion when he compels or induces another

person to deliver such property to himself or to a third person by means of instilling fear that, if the property is not so delivered, the actor will: (ii) Cause damage to property; or (iii) Engage in other conduct constituting a crime; or (ix) Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his . . . business, calling, career, financial condition . . ."

d) 75 brokers'[3] business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire

---

3 ITEX in Birmingham (Birmingham, AL), ITEX in Gulf Shores (Orange Beach, AL), ITEX in Arizona (Phoenix, AZ), ITEX in Denver South (Denver, CO), ITEX in Denver (Denver, CO), ITEX in Fairfield (Fairfield, CT), ITEX East Fort Lauderdale - Oakland Park (Fort Lauderdale, FL), ITEX in Boynton Beach (Boynton Beach, FL), ITEX in Ft. Lauderdale - Plantation (Plantation, FL), ITEX in Lauderdale by the Sea (Southeast, FL), ITEX in Lauderdale by the Sea (Daytona Beach, FL), ITEX in Melbourne (Melbourne, FL), ITEX in Naples (Naples, FL), ITEX in Pompano Beach (Pompano Beach, FL), ITEX in St. Augustine (St. Augustine, FL), ITEX in St. Augustine (Sarasota, FL), ITEX in Tampa (Tampa, FL), ITEX in Tampa-Trinity (New Port Richey, FL), ITEX in Vero Beach (Vero Beach, FL), ITEX in Atlanta East (Savannah, GA), ITEX in Atlanta North (Atlanta, GA), ITEX in Boise (White Bird, ID), ITEX in Bloomington (Bloomington, IL), ITEX in Chicago (Chicago, IL), ITEX in Chicago North (Schaumburg, IL), ITEX in Peoria (Peoria, IL), ITEX in Columbus (Columbus, IN), ITEX in Indianapolis (Indianapolis, IN), Matthew Moots (Overland Park, KS), ITEX in Bowling Green (Bowling Green, KY), ITEX in Kentuckiana (Louisville, KY), ITEX in Louisville (Louisville, KY), ITEX in Boston (Waltham, MA), ITEX in Detroit (Highland, MI), ITEX in Grand Rapids (Grand Haven, MI), ITEX in Duluth (Duluth, MN), ITEX in Minneapolis East (Lake Elmo, MN), ITEX in Minneapolis North (Minneapolis / St Paul, MN), ITEX in Minneapolis South (Burnsville, MN), ITEX in Minneapolis West (Minneapolis, MN), ITEX in St. Louis (St Louis, MO), ITEX in Omaha (Ralston, NE), ITEX in Omaha West (Bennington, NE), ITEX in Las Vegas, (Las Vegas, NV), ITEX in Reno (Reno, NV), ITEX in Manhattan (Rahway, NJ), ITEX in Albuquerque (Albuquerque, NM), ITEX in Manhattan (New York, NY), ITEX in Charlotte (Charlotte, NC), ITEX in Raleigh (Raleigh, NC), ITEX in Wilmington (Carolina Beach, NC), David & Nikki Normant, ILB (Hayesville, OH), ITEX in Cincinnati (Cincinnati, OH), ITEX in Cleveland Central (Cleveland, OH), ITEX in Cleveland West (Cleveland, OH), ITEX in Columbus (Worthington, OH), ITEX in Oklahoma City (Oklahoma City, OK), ITEX in Tulsa (Tulsa, OK), ITEX in Portland North (Portland, OR), ITEX in Medford (Medford, OR), ITEX in Oregon City (Oregon City, OR), ITEX in Philadelphia (Jenkintown, PA), ITEX in Scranton (Dunmore, PA), ITEX in Knoxville (Knoxville, TN), ITEX in Nashville - Hendersonville (Hendersonville, TN), ITEX in Dallas Fort Worth (Dallas/Ft Worth, TX), ITEX in Houston (New Caney, TX), ITEX in Houston (Houston, TX), ITEX in Lubbock (Lubbock, TX), ITEX in San Antonio (San

fraud and money laundering. The RICO defendants caused ITEX to continually use U.S. Mail and interstate wires to transact and fraudulently deceive 75 persons into buying brokerships in 47 states that ITEX cannot lawfully do business. These fraudulent brokership sales are estimated to be several millions of dollars. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed a separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

e) 12 brokers' business and property in three states that ITEX is authorized to do business were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to continually use U.S. Mail and interstate wires to transact and fraudulently deceive 12 persons into buying brokerships without disclosing that ITEX could not lawfully do business in 47 states. These fraudulent brokership sales are estimated to be millions of dollars. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed a separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

f) 9,070 ITEX members' business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to continually use U.S. Mail and interstate wires to transact and fraudulently deceive 9,070 persons into buying memberships in 47 states that ITEX cannot lawfully do business. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed a separate predicate RICO offenses within the meaning of 18 USC § 1961(1). These fraudulent membership sales are estimated to be several millions of dollars.

g) 12,930 ITEX members' business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to continually use U.S. Mail and interstate

---

Antonio, TX), Timco, Inc. (Austin, TX), ITEX in Provo (Provo, UT), ITEX in Salt Lake City (Salt Lake City, UT), ITEX in Salt Lake City - North (N. Ogden, UT), and Atlantic Trade Exchange, Inc. (Virginia Beach, VA).

wires to transact and fraudulently deceive 12,930 persons into buying memberships without disclosing that ITEX cannot lawfully do business in 47 states. These fraudulent membership sales are estimated to be several millions of dollars. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed a separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

h) 47 states of the United States were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. ITEX has unlawfully conducted business in most of these 47 states for over 20 years. In 10 years alone, the RICO defendants caused ITEX to continually use U.S. Mail and interstate wires to transact, launder, and unlawfully evade payment of taxes and tax filings due to 47 states on an estimated **$2.35 billion** of sales, **$35,373,000** of association fees, and additional millions of dollars in the sales of brokerships and memberships. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed a separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

i) The United States was injured by reason of the RICO defendants' predicate offenses of mail/wire fraud. For at least a 10-year period, the RICO defendants caused ITEX to continually use U.S. Mail, interstate wires, and/or private courier to defraud the United States by filing tax returns that concealed and laundered unlawful income estimated to be **$2.35 billion** of sales, **$35,373,000** of association fees, and additional millions of dollars in the sales of brokerships and memberships. Each time the RICO defendants sent the United States a tax return via U.S. Mail, interstate wires, or interstate courier, the RICO defendants committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

j) John O'Meara's ("O'Meara") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle, and subsequently return, O'Meara's funds. On February 19, 2012, O'Meara stated that he had "a major issue with ITEX" and that ITEX tried to embezzle money from his account and shut him down. He also stated when his attorney contacted ITEX "they stopped the nonsense." Each time the RICO defendants sent an interstate email or used the mail they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

k) Paul Blank's ("Blank") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Blank's funds. On February 23, 2014, Blank stated that his account was embezzled and "drawn down" between $3,000 and $5,000 a few years ago without his consent. Because of flooding at his home, he was unable to recover the related paperwork and stated "unequivocally that this happened to my account." Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

l) Jill Clarvit's ("Clarvit") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Clarvit's funds. On February 28, 2014, Clarvit stated that on March 12, 2012, ITEX embezzled $624 from her account. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

m) Pearl Herzog's ("Herzog") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Herzog's funds. On February 24, 2014, Herzog stated that in April 2013 ITEX embezzled "a little over $6,000" from her account. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

n) Edward Dicken's ("Dicken") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Dicken's funds. On February 25, 2014, Dicken stated that on September 26, 2012 and on December 15, 2013, ITEX embezzled $3,000 and $300, respectively, from his account. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

o) Dr. Emil Chynn's ("Dr. Chynn") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Dr. Chynn's funds. On April 4, 2014, Dr. Chynn stated that from January to March 2013, ITEX embezzled $600 per month from his account. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

p) Dr. Whistance-Smith's ("Dr. Smith") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Dr. Smith funds. Dr. Smith (wjws@concordian.com) stated, "I'm currently involved in pursuing ITEX on a fraudulent land deal worth $600K. This is being pursued with the Toronto Fraud Squad and the RCMP Fraud Squad." Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

q) Larry Chiang's ("Chiang"), of United College Marketing Services, business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Chiang's funds. Chiang stated over $12,686.63 in trade credits were "lost" and warns businesses to "Beware of entering into the ITEX Barter Network" (http://www.barternewsweekly.com/2010/01/20/merchants-barter-continues-assault-on-ITEX-1455/). Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

r) David's ("David") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle David's funds. David stated "I know that I am not the only person who was ripped off by their [ITEX's] unscrupulous business practices. It's nice to see that ITEX corporate finally did something about it. Now if I could just get my $10,000 back" (http://rippedoffbyITEX.blogspot.com/). Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

s) Sigal Cohen's ("Cohen"), of S Designs LLC, business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Cohen's funds. On March 16, 2014, Cohen stated that, about March 6, 2012, $1,800 was embezzled from his account "AND NOBODY CARED!" On August 26, 2014, Cohen also stated that ITEX embezzled "around $4,159" from his account. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

t) Kim Kraunz's ("Kraunz") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Kraunz's funds. On February 21, 2012, Kraunz stated: "Our account (in an office managed by John Castoro) was also debited for purchases we did not authorize. We eventually had all issues resolved but it took almost 9 months for resolution." Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

u) Jamie Harrison's ("Harrison") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and/or interstate wires to transact Harrison's funds. On February 21, 2012, Harrison stated that, on January 3, 2012, he had a $30,000 positive balance in his account and was placed in ITEX's "Spend Down status" and was forced spend the $30,000. Each time the RICO defendants sent an interstate email or used the mail they committed separate predicate RICO offenses within the meaning of 18 USC § 1961 (1).

v) Nancy Donenfeld's ("Donenfeld") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Donenfeld's funds. On March 9, 2012, Donenfeld stated: "My experience with ITEX has as well been miserable. They clearly cheated me illegally out of over $1000 and refuse to do anything about it." Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered

funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

w) Tzippy Spear's ("Spear") business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Spear's funds. On February 19, 2012, Spear stated: "I had a similar incident – with more money involved, but after a lot of aggravation, they credited my account. Corporate did not want to get involved. I was prepared to go to the Attorney General." Each time the RICO defendants sent an interstate email, or used the mail they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

x) Bill's ("Bill"), at b-jbill@comcast, business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Bill's funds. On February 21, 2012, Bill stated: "I HAD 25000 ITEX DOLLARS AND $1300+ DOLLARS TAKEN OUT OF MY ACCT. WITH NO RESOLUTION OF THE PROBLEM!!!!! Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

y) Mendy's ("Mendy"), at raitportm@juno.com, business and property were injured by reason of the RICO defendants' racketeering and predicate offenses of mail/wire fraud and money laundering. The RICO defendants caused ITEX to use U.S. Mail and interstate wires to transact and embezzle Mendy's funds. On February 23, 2014, Mendy stated $2,000 was embezzled from his account and, when he complained, Castoro called him a "Greedy Jew." Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email, used the mail, or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

z) Ian Olito's ("Olito"), NYTO's former Vice President, property was injured by reason of the RICO defendants' racketeering and predicate offense of money laundering. On January 8, 2012, Olito stated: "Back in 2008 John [Castoro] or Izzy [Garcia] forged my name on a credit card form. I have all the documents from the bank stating it was fraud and the bank gave my $$ back. John [Castoro] always said it was a mistake and he was sorry. I didn't realize how evil this man is." Each time Castoro or Garcia committed credit card fraud by using interstate mail/wires and laundered

funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

Olito also stated that Castoro withholds offering Bella Visa and Battleground Country Club golf memberships to ITEX members "and sells them for cash to his friends." Olito estimates that Castoro "earns tax free about $40,000 per year for the last three years." Each time Castoro used interstate wires or mail he committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

aa) Patricia Adams' ("Adams") property was injured by reason of the RICO defendants' racketeering and predicate offenses of interstate gambling and unlawful debt collection, wire fraud, and money laundering. The RICO defendants caused ITEX to use interstate wires to promote interstate gambling and to collect unlawful interstate gambling debts. On February 1, 2012 (Exhibit 16) Garcia, on behalf of ITEX, emailed at least 669 NYS, New Jersey ("NJ"), and other interstate members, including Adams, to promote unlawful pool betting on Super Bowl XLVI held on February 5, 2012. On or about February 1, 2012, ITEX deducted two unlawful debts of $250 each ($500), plus a 6% to 7.5% "cut of the pot", from Adams' account. Subsequently, the RICO defendants caused ITEX to launder these funds. Each time the RICO defendants sent an interstate email or laundered funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

4. **Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering shall include the following information:**

Since at least 2003, to date, and likely continuing into the future, the RICO defendants have four "open ended" patterns of racketeering activities and an additional racketeering activity of interstate gambling and collections of unlawful debts.

   i) As a regular way of doing business, the RICO defendants knowingly and fraudulently cause ITEX to conceal from prospective and 22,000 current members and prospective and 97 current brokers that ITEX is, unlawfully doing business in 47 states (Exhibit 4). The purpose of this concealment is to:

   1) Continue unlawfully selling ITEX memberships and brokerships in the 47 states that ITEX is not authorized to do business.

   2) Continue unlawfully making sales, collecting commissions, and collecting association fees from

-15-

9,070 ITEX members[1] within the 47 states that ITEX is not authorized to do business.

ITEX has unlawfully conducted business in most of the 47 states for over 20 years. In the past 10 years alone, the RICO defendants caused ITEX to fraudulently use the U.S. Mail and interstate email wires in these 47 states to unlawfully transact an estimated $2.35 billion of sales, $35,373,000 of association fees, additional millions of dollars in the sales of brokerships and memberships, and launder these illicit funds through tax returns by reporting that these funds were obtained lawfully.

In NYS and NJ, two of the 47 states that ITEX is not authorized to do business, the RICO defendants direct, approve, or encourage NYTO to send out thousands of emails every month to 669 members that unlawfully promote sales on behalf of ITEX. Charles Cruikshank, Esq., one of NYTO's attorneys, admits:

> "NYTO sends approximately 10 email broadcasts per day to its members and thousands of other communications per month, some of which or the other deal with the availability of products and services." (Exhibit 12)

ii) As a regular way of doing business, the RICO defendants permit systemic embezzlements of funds transferred to, and held by, ITEX and brokers for transactions between members that are not completed. When members purchase merchandise for future use, such as for advertising or restaurant certificates, the members' funds are often transferred into, and comingled with, ITEX's or a broker's account *and are not transferred into the account of the ITEX member who sold the merchandise*. When transactions between members are not completed ITEX or the broker will embezzle these funds by refusing to return and taking ownership of them.

Under the pretext of selling advertising for future use, ITEX sold Bal $24,720 on December 26, 2002 (Exhibit 8), sold Bal $25,750 on November 21, 2003 (Exhibit 9), and sold eBuy-Sell $6,180 on December 13, 2004 (Exhibit 10). These transactions were not completed and the RICO defendants caused ITEX to embezzle these funds by refusing to return and taking ownership of them.

-16-

In addition, ITEX sold eBuy-Sell $700 of Onyx restaurant gift certificates in April 2007, $100 of KOODOOS gift certificates, $100 of La Grolla restaurant gift certificates, $100 of Dewey's Flatiron restaurant gift certificates, $150 of Nathan Hale's restaurant gift certificates, $250 of Frere Jacques restaurant gift certificates, $80 of Joanne's Gourmet Pizza restaurant gift certificates, $150 of Nation restaurant gift certificates, and, on September 10, 2008, $472 was refunded to eBuy-Sell from Manhattan Mini Storage. ITEX embezzled these funds by refusing to return and taking ownership of them.

To accomplish the above embezzlements, the RICO defendants caused ITEX to use predicate offenses of mail fraud, wire fraud, and the laundering of these funds through tax returns.

iii) As a regular way of doing business, the RICO defendants created a "Spend Down status" to embezzle funds from ITEX members. Members that seek to cancel their memberships will systemically have their funds withheld, embezzled, and laundered.

The Spend Down status, in relevant part, states:

> "[If] your Account has a positive ITEX dollar balance (where sales exceed purchases), the Account may be placed in "Spend Down status," after ITEX is paid any Fees then owing plus the transaction fee on the positive balance. Spend Down status shall mean you will have twelve months to spend the positive balance in your Account . . . At the end of the twelve-month period . . . ITEX, in its sole discretion, may terminate the Account, regardless of any remaining positive ITEX dollar balance . . . You may forfeit your positive ITEX dollar balance by so instructing ITEX in writing and no further fees will be assessed." (Exhibit 18, Rule 5.4. Spend Down Status)

*ITEX will withhold and refuse to refund the balance in any members' account.* In addition to withholding members' account balances, members seeking to cancel their membership are required to pay an *unearned* commission (transaction) fee on the balance in their account that ITEX refuses to refund. For example, members with a $10,000 balance and a 7.5% commission rate are immediately required to pay ITEX an unearned commission of $750. "At

the end of the twelve-month period", members will have their funds embezzled and subsequently laundered by ITEX.

Members canceling their membership due to discovering that funds were embezzled from their account will be further victimized by being placed in ITEX's Spend Down status.

On February 21, 2012, Jamie Harrison stated that on January 3, 2012, he had a $30,000 positive balance in his account and was placed in ITEX's "Spend Down status" and was forced to spend the $30,000 or lose it.
To accomplish the Spend Down status-related embezzlements, the RICO defendants cause ITEX to use predicate offenses of mail fraud, wire fraud, and money laundering.

iv)    As a regular way of doing business, the RICO defendants allow themselves and their brokers to access members' private financial account information without members' authorization. This is a violation of privacy and results in direct embezzlements from members' accounts. See section 3 j) to aa), the statements of ITEX members that claim direct embezzlements from their account.

To accomplish these embezzlements, the RICO defendants cause ITEX and/or its brokers to use predicate offenses of mail/wire fraud and money laundering.

v)    The RICO defendants cause and permit ITEX to organize, promote, and maintain unlawful interstate gambling operations and collection of unlawful debts.

    1)    On February 7, 2011, Garcia, on behalf of ITEX, emailed at least 669 ITEX members in NYS, NJ, and other states to organize, promote, and maintain an interstate poker tournament on February 17, 2011 (Exhibit 13). At least one player played on behalf of ITEX. Winnings and losses were added to and deducted from ITEX members' accounts via interstate wires. In addition to collecting the unlawful debts of the losers, ITEX "cut the pot" and collected additional unlawful debts by receiving 6% to 7.5% of all the losses and winnings of the players. Each time the RICO defendants caused ITEX to send an interstate email, added funds to, or deducted funds from, an ITEX members' account, and laundered these funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

2)  On February 11, 2011, Castoro, on behalf of ITEX, emailed at least 669 ITEX members in NYS, NJ, and other states to organize, promote, and maintain Texas Hold 'Em gambling on February 17, 2011 (Exhibit 14). At least one player played on behalf of ITEX. Winnings and losses were added to and deducted from ITEX members' accounts via interstate wires. In addition to collecting the unlawful debts of the losers, ITEX "cut the pot" and collected additional unlawful debts by receiving 6% to 7.5% of all the losses and winnings of the players. Each time the RICO defendants caused ITEX to send an interstate email, added funds to, or deducted funds from, an ITEX members' account, and laundered these funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

3)  On May 10, 2011, ITEX emailed at least 669 ITEX members in NYS, NJ, and other states to organize, promote, and maintain Texas Hold 'em gambling on June 9, 2011 (Exhibit 15). At least one player played on behalf of ITEX. Winnings and losses were added to and deducted from ITEX members' accounts via interstate wires. In addition to collecting the unlawful debts of the losers, ITEX "cut the pot" and collected additional unlawful debts by receiving 6% to 7.5% of all the losses and winnings of the players. Each time the RICO defendants caused ITEX to send an interstate email, added funds to, or deducted funds from, an ITEX members' account, and  laundered these funds they committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

4)  On February 1, 2012, Garcia, on behalf of ITEX, emailed at least 669 ITEX members in NYS, NJ, and other states to organize, promote, and maintain a gambling pool for Super Bowl XLVI held on February 5, 2012 (Exhibit 16). Winnings and losses were added to and deducted from ITEX members' accounts via interstate wires. In addition to collecting the unlawful debts of the losers, ITEX "cut the pot" and collected additional unlawful debts by receiving 6% to 7.5% of all the losses and winnings of the players. Each time the RICO defendants caused ITEX to send an interstate email, added funds to, or deducted funds from, an ITEX members' account, and  laundered these funds they

committed separate predicate RICO offenses within the meaning of 18 USC § 1961(1).

The RICO defendants can violate any subsection of 18 USC § 1962 if it collects or conspires to collect "an unlawful debt." 18 USC § 1961(6) defines "unlawful debt" to include debt arising from the operation of illegal gambling. In other words, the collection of an unlawful debt itself violates RICO even without a "pattern" of "racketeering activity."

**a. List the alleged predicate acts and the specific statutes that were allegedly violated;**

i. **18 USC § 1341 - Frauds and swindles and**
   **18 USC § 1343 - Fraud by wire, radio, or television**

The mail and wire fraud statutes are essentially the same, except for the medium associated with the offense – the mail in the case of mail fraud and wire communication in the case of wire fraud.

See section 4 i) to v) and Exhibit 17. The RICO defendants violated the mail and wire fraud statutes by sending, or causing to be sent, communications through the U.S. Mail and interstate wires in furtherance of a scheme to defraud, deceive, and deprive 47 states, prospective and current ITEX members, and prospective and current brokers out of property and honest services.

Criminal mail and wire fraud involves: (1) the use of either mail or wire communications in the foreseeable furtherance (2) of a scheme to defraud (3) involving a material deception (4) with the intent to deprive another of (5) either property or honest services. See *Mail and Wire Fraud: A brief Overview of Federal Criminal Law,* Charles Doyle, July 21, 2011 and *In re Sumitomo Copper Litig.,* 995 F. Supp. 451, 455 (S.D.N.Y. 1998).

The statutes require that a mailing or wire communication be in furtherance of a scheme to defraud. It need not be an essential element of the scheme, as long as it "is incidental to an essential element of the scheme." See *Shumuck v. United States,* 489 U.S. 705, 712 (1989).

A qualifying mailing or communication, standing alone, may be routine or innocent. The RICO defendants need not personally have mailed or wired a communication; it is enough that the RICO defendants "caused" a mailing or transmission of a wire communication in the sense that the mailing or transmission was the reasonable foreseeable consequence of the intended scheme. See *Pereira v. United States,* 347 U.S. at 8-9.

ii.    **18 USC § 1956 - Laundering of monetary instruments**

ITEX publically states that it transacts $250 million of business annually. An estimated $235 million of this business are proceeds knowingly and unlawfully derived from 47 states that ITEX is not authorized to do business. From at least 2003 and to the present, ITEX intentionally promoted and carried on this unlawful activity, avoided transaction reporting requirements under state and federal law, and violated section 7201 and 7206 of the Internal Revenue Code of 1986. ITEX has unlawfully conducted business in most of these 47 states for over 20 years. In the past 10 years alone, ITEX has laundered the taxes due to these 47 states on an estimated **$2.35 billion** of sales, **$35,373,000** of association fees, and millions of dollars of brokership and membership fees.

iii.    **18 USC § 1957 - Engaging in monetary transactions in property derived from specified unlawful activity**

From 2003 to the present, the RICO defendants caused ITEX to defrauded 75 persons by crossing state lines and selling them brokerships in excess of $10,000 each in 47 states that ITEX is not authorized to do business. *This is the equivalent of a con artist selling the rights to the Brooklyn Bridge.*

The RICO defendants twice caused ITEX to cross state lines and embezzle funds from Bal's account that exceeded $10,000. On December 26, 2002, ITEX embezzled $24,720 from Bal's account (Exhibit 8) and, on November 21, 2003, ITEX embezzled $25,750 from Bal's account (Exhibit 9).

The RICO defendants crossed state lines and caused ITEX to commit the following embezzlements:

On February 21, 2012, Bill at b-jbill@comcast stated: "I HAD 25000 ITEX DOLLARS AND $1300+ DOLLARS TAKEN OUT OF MY ACCT. WITH NO RESOLUTION OF THE PROBLEM!!!!!

David (http://rippedoffbyITEX.blogspot.com/) stated "I know that I am not the only person who was ripped off by their [ITEX's] unscrupulous business practices. It's nice to see that ITEX corporate finally did something about it. Now if I could just get my $10,000 back."

Larry Chiang, of United College Marketing Services, stated over $12,686.63 in trade credits were "lost" and warns businesses to

"Beware of entering into the ITEX Barter Network"
(http://www.barternewsweekly.com/2010/01/20/merchants-barter-continues-assault-on-ITEX-1455/).

Dr. Whistance-Smith (wjws@concordian.com) stated, "I'm currently involved in pursuing ITEX on a fraudulent land deal worth $600K. This is being pursued with the Toronto Fraud Squad and the RCMP Fraud Squad."

iv.  **18 USC § 1960 - Prohibition of unlicensed money transmitting businesses**

ITEX is an unlicensed money transmitting business. ITEX publically states that it annually transacts $250 million of business throughout the United States. The RICO defendants direct, approve, encourage, and cause ITEX to transmit this $250 million of business through interstate wires and ITEX checks. These financial transactions are transmitted in USDs, ITEX's virtual currency, and ITEX checks.

ITEX's March 12, 2014 press release entitled: "ITEX Launches Virtual Currency Systems" states ITEX "utilizes the [virtual currency] platform to power its own b2b business model and virtual currency, the ITEX dollar" and ITEX's "virtual currency payment system allows member businesses to transfer value to acquire products and services without exchanging cash" (Exhibit 19).

Exchangers of currency or virtual currency, including ITEX's virtual currency, are considered money transmitters under federal law and are subject to federal anti-money laundering regulations. See 31 C.F.R. § 1010.100 (ff) (5); see also Department of the Treasury Financial Crimes Enforcement Network ("FinCEN"), Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, March 18, 2013, FIN-2013-G001, available at: http://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html.

Specifically, federal regulations require a virtual currency exchanger to register with FinCEN as a money services business and to develop and maintain an effective anti-money laundering program. See 31 C.F.R. §§ 1022.210, 1022.380.

Unlicensed money transmitting is also unlawful in NYS. New York state law provides that it is illegal to receive money for transmission, or to transmit money, or to issue checks without a license issued by the Superintendent of Banks. See N.Y. Banking Law § 641.

v.     **18 USC § 1961(D) fraud in the sale of securities**

Since 2003 and continuing to the present, the RICO
defendants caused ITEX to fraudulently sell securities by
unlawfully concealing from prospective and current
shareholders that ITEX is not authorized to do business in
47 states.

vi.     **18 USC § 1084 - Transmission of wagering information**

See section 4 v), 1) to 4).

vii.     **18 USC § 1344 - Bank fraud**

The RICO defendants cause ITEX to operate as an
unlicensed bank. Itex opens and closes accounts, accepts
deposits, makes withdrawals, issues checks, issues debit
cards, transfers funds, issues monthly statements, makes
interest bearing loans, and annually reports each member's
sales activity to the IRS on form 1099B.

Without authorization, White, Best, and Wade committed
bank fraud by awarding Best approximately $100,000
between 2005 and 2007 under false pretenses of "consulting
services" at a time when Best's company (Morse Best)
was struggling. There was no competitive bidding for
these consulting services, no apparent need for these
consulting services, and no demonstrable results of Best's
consulting services.

Without authorization, in 2011, White, Best, and Wade
committed bank fraud by increasing White's compensation
from $428,093 to $1,068,480.

Without authorization, on March 30, 2011, White, Best,
and Wade committed bank fraud by selling 151,000 of
ITEX's shares to 19 persons within the ITEX Broker
Network for the discounted price of $4 per share under
the condition <u>the shares had to "be voted in accordance
with the recommendations of the Board of Directors
[White, Best, and Wade] and an irrevocable proxy be
given to the corporate secretary of ITEX</u>." These 19
persons were not required to pay cash and no credit
checks were performed to determine their ability to pay for
the shares.

Without authorization, on March 30, 2011, White, Best, and Wade committed bank fraud by awarding themselves 195,000 shares of ITEX stock. White received 190,000 shares and, as an apparent gratuity, Wade received 5,000 shares.

viii.  **18 USC § 1951 - Interference with commerce by threats or violence**

The RICO defendants caused ITEX to interfere with eBuy-Sell's interstate commerce. eBuy-Sell's customers are 22,000 ITEX members throughout the United States.

On June 4, 2007, ten days after filing the State Court lawsuit against ITEX, NYTO, Castoro, Garcia, et al., Castoro telephoned and angrily threatened that if Bal did not withdraw the State Court lawsuit that Castoro would, "Sue [Bal] for millions of dollars and put [eBuy-Sell] out of business by freezing the account." On June 6, 2007, Castoro caused ITEX to freeze eBuy-Sell's account. This prevented eBuy-Sell from selling merchandise to, and purchasing merchandise from, 22,000 ITEX members throughout the United States. In an email, Castoro stated eBuy-Sell's account was "frozen do [sic] to pending litigation" (Exhibit 11). *This is the modern day equivalent of burning eBuy-Sell's business to the ground!*

ix.  **18 USC § 1952 - Interstate and foreign travel or transportation in aid of racketeering enterprises**

ITEX has 97 brokers throughout the United States, Canada, and Panama. Upon information and belief, one or more of the RICO defendants traveled to Canada to establish ITEX – Canada and traveled to Panama to establish ITEX - Latin America. In addition, most of the 97 brokers have annual "ITEX Trade Fairs." The RICO defendants cause ITEX to send out emails that encourage members to attend these interstate ITEX Trade Fairs to buy and sell merchandise. As an example, on April 14, 2004, Garcia, on behalf of ITEX, sent an email to at least 669 ITEX members in NYS, NJ, and other states to attend an ITEX Trade Fair on April 15, 2004 in Wayne, NJ (Exhibit 20). ITEX is not authorized to do business in either NYS or NJ.

x.  **18 USC § 2314 - Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting**

Under embezzlement and false pretenses, the RICO defendants caused ITEX to unlawfully transmit in interstate commerce money of the value of $5,000 or more that crossed state lines.

As demonstrated herein, from 2003 to the present, under false pretenses the RICO defendants caused ITEX to defraud 75 persons by selling them brokerships in 47 states that ITEX is not authorized to do business. Funds for each of these 75 brokerships exceeded $5,000 and were transmitted across state lines.

As demonstrated herein, under false pretenses, the RICO defendants caused ITEX to twice embezzle funds from Bal's account that exceeded $5,000 and transmitted these funds in interstate commerce that crossed state lines: $24,720 on December 26, 2002 (Exhibit 8) and $25,750 on November 21, 2003 (Exhibit 9).

As demonstrated herein, under false pretenses, the RICO defendants caused ITEX to embezzle funds from eBuy-Sell's account that exceeded $5,000 and transmitted these funds in interstate commerce that crossed state lines: $6,180 on December 13, 2004 (Exhibit 10).

xi.    **18 USC § 2315 - Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps**

The RICO defendants caused ITEX to receive and possess in interstate commerce that crossed state lines money in excess of $5,000.

From 2003 to the present, the RICO defendants caused ITEX to defraud 75 persons by selling brokerships in 47 states that ITEX is not authorized to do business.  Funds for each of these brokerships exceeded $5,000 and were transmitted across state lines.

The RICO defendants caused ITEX to twice embezzle funds from Bal's account that exceeded $5,000 and transmitted these funds in interstate commerce that crossed state lines: $24,720 on December 26, 2002 (Exhibit 8) and $25,750 on November 21, 2003 (Exhibit 9).

The RICO defendants caused ITEX to embezzle funds from eBuy-Sell's account that exceeded $5,000 and transmitted these funds in interstate commerce that crossed state lines: $6,180 on December

13, 2004 (Exhibit 10).

**b. If the RICO claim is based on the predicate offenses of [mail and] wire fraud, or fraud in the sale of securities, the circumstances of fraud or mistake shall be stated in particularity;**
Since 2003 and continuing to the present, the RICO defendants cause ITEX to fraudulently sell securities by unlawfully concealing from shareholders that ITEX is not authorized to do business in 47 states.

Mail and wire fraud: See section 4 i) to v) and Exhibit 17.

**c. Describe how the predicate acts form a "pattern of racketeering activity"; and**

See section 4 i) to v).

**d. State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe.**

See section 4 i) to v). The RICO defendants have four "open ended" patterns of racketeering activities and a racketeering activity of interstate gambling and collection of unlawful debts.

The separate racketeering activities relate to each other as part of an overall common plan by the RICO defendants to unlawfully obtain substantial amounts of funds.

5. **Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:**

   **a. State the names of the individuals, partnerships, corporations, associations, or other legal entities that allegedly constitute the enterprise;**

   White, Best, Wade, Benson, NYTO, Castoro and Garcia are the association-in-fact criminal enterprise. Upon completion of discovery, additional defendants are likely to be added.

   Upon information and belief, aiding and abetting the RICO defendants is the law firm of Frankfurt Kurnit Klein and Selz, law firm of Joseph Maira, law firm of Tollefsen Law, law firm of Charles Cruikshank, the accounting firm of Ehrhardt Keefe Steiner & Hottman, U.S. Bank, and a presently unknown computer software company that designs ITEX's programs.

**b. Describe the structure, purpose, function and course of conduct of the enterprise;**

The purpose and function of the association-in-fact enterprise is to carry out the course of conduct described in section 4 i) to v). The association-in-fact enterprise has an ascertainable structure and the longevity sufficient to pursue its racketeering goals. White appears to be the head of the association-in-fact enterprise.

**c. State whether any defendants are employees, officers or directors of the alleged enterprise;**

The RICO defendants are separate from ITEX and are not employees, officers, or directors of the alleged association-in-fact enterprise.

**d. State whether any defendants are associated with the alleged enterprise; and**

White, Best, Wade, Benson, NYTO, Castoro, and Garcia are associated with the enterprise.

**e. State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise.**

White, Best, Wade, Benson, NYTO, Castoro, and Garcia are the association-in-fact enterprise.

6. **Describe the alleged relationship between the activities of the enterprise and how the pattern of racketeering activity differs from the usual and daily activities of the enterprise defendants, if at all.**

The usual daily activities of the RICO defendants differ from the racketeering activities of the association-in-fact enterprise. The RICO defendants participate daily in *lawful* activities on behalf of ITEX. Separately, the RICO defendants also participate in *unlawful* activities in furtherance their racketeering activities.

The lawful conduct of the RICO defendants is intended to provide an ongoing appearance of legitimacy. The RICO defendants' unlawful conduct is intended to provide an on-going source of substantial illicit financial gain. The illicit financial gains are reinvested into ITEX, invested in interstate and foreign businesses, used to purchase and control interstate and foreign businesses, and funneled to the RICO defendants

as awards of ITEX's shares, cash awards, incentive compensation, bonuses, salaries, commissions, and distributions.

7. **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

Since 2003, to date, and likely continuing into the future, the RICO defendants substantially affected interstate and foreign commerce. The RICO defendants caused ITEX to: 1) commit numerous predicate offenses of mail and wire fraud throughout the United States, Canada, and Panama, 2) defraud 47 states by evading the taxes and tax filings due on an estimated **$2.35 billion** of sales, **$35,373,000** of association fees, and additional millions of dollars in the sales of brokerships and memberships, 3) conceal from prospective and 22,000 current members and prospective and 97 current brokers throughout the United States, Canada, and Panama that ITEX is not authorized to do business in 47 states, 4) sell 75 brokerships to persons in the 47 states that ITEX is not authorized to do business, and 5) organize, promote, and maintain unlawful interstate gambling and debt collection.

8. **If the complaint alleges a violation of 18 USC § 1962(a), provide the following information:**

   a. **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

      In addition to the investments in, and purchases of, the businesses cited in subsections (b) and (c) below, the illicit financial gains are reinvested in ITEX, funneled to the RICO defendants as awards of ITEX' shares, awards of cash, incentive compensation, bonuses, salaries, commissions, and distributions. In addition, the RICO defendants employ the law firms of Frankfurt Kurnit Klein and Selz, Joseph Maira, Tollefsen Law, Charles Cruikshank, the accounting firm of Ehrhardt Keefe Steiner & Hottman, an unknown software company that designs ITEX's programs, and interest charges paid on loans from U.S. Bank.

   b. **Describe the use of investment of such income.**

      The RICO defendants caused ITEX to use part of their illicit financial gains to invest in the following interstate and foreign businesses: Can Am Trade Incorporated (2003), ITEX Canada (2003), BXI Exchange, Inc. (2005), Intagio Corporation of San Francisco (2007), ITEX Latin America (2009), Super Trade Exchange (2009), Idearc's on-line marketplace (2009), and ITEX Virtual Currency Systems (2014).

9. **If the complaint alleges a violation of 18 USC § 1962(b), describe the acquisition or maintenance of any interest in or control of the alleged enterprise;**

> The RICO defendants caused ITEX to acquire and maintain interest and control of the following interstate and foreign businesses: Can Am Trade Incorporated (2003), ITEX Canada (2003), BXI Exchange, Inc. (2005), Intagio Corporation of San Francisco (2007), ITEX Latin America (2009), Super Trade Exchange (2009), Idearc's on-line marketplace (2009), and ITEX Virtual Currency Systems (2014).

10. **If the complaint alleges a violation of 18 USC § 1962(c), provide the following information:**

> a. **State who is employed by or associated with the enterprise; and**
>
> White, Best, Wade, Benson, NYTO, Castoro, and Garcia are associated with the association-in-fact-enterprise.
>
> The RICO defendants employ or are associated with a software firm to develop sophisticated computer programs, the law firm of Frankfurt Kurnit Klein and Selz, the law firm of Joseph Maira, the law firm of Tollefsen Law, the law firm of Charles Cruikshank, the accounting firm of Ehrhardt Keefe Steiner & Hottman, and U.S. Bank.
>
> b. **State whether the same entity is both the liable" person" and the "enterprise" under 18 USC § 1962(c).**
>
> The RICO defendants are both the liable "person" and the association-in-fact "enterprise."

11. **If the complaint alleges a violation of 18 USC 1962(d), describe the alleged conspiracy.**

To effectuate the conspiracy, the RICO defendants violated 18 USC § 2 by aiding and abetting each other, agreeing to, and cooperating in the commission of predicate acts by approving, implementing, participating in, or conducting affairs of the association-in-fact enterprise through a pattern of racketeering activity demonstrated in section 4 and 4 i) to v) above and a conspiracy to violate 18 USC §§ 1962(a), (b), and (c) in violation of 18 USC § 1962(d).

Upon information and belief, the conspiracy was aided and abetted by: 1) U.S. Bank to obtain loans to finance their racketeering activities, 2) the accounting firm of Ehrhardt Keefe Steiner & Hottman to prepare tax

returns that concealed and laundered ITEX's unlawful income, 3) 75 brokers that made sales within the 47 states that ITEX is not authorized to do business, 4) 19 persons to rig the May 14, 2012 and December 13, 2013 shareholders' elections, and 5) third parties to develop sophisticated computer software to mail and email 22,000 billing statements every 4 weeks, process payments, make adjustments, and send out thousands of emails promoting sales through ITEX's marketplace.

The goals of the conspiracy are to: 1) conceal that ITEX is not authorized to do business in 47 states, 2) continue collecting substantial amounts of commissions and association fees from members in 47 states that ITEX is not authorized to do business, 3) continue embezzling funds from ITEX members, 4) continue conducting unlawful interstate gambling and debt collection, 5) selling brokerships and memberships in 47 states that ITEX is not authorized to do business, and 5) other predicate acts described in section 4, 4a, and 4b.

The RICO defendants conspired to: 1) use the proceeds of their racketeering activities to invest and acquire an interest in enterprises engaged in interstate and foreign commerce as described in section 8 and is in violation of 18 USC § 1962(a), 2) used the proceeds of their racketeering activities to acquire an interest in and control of enterprises engaged interstate and foreign commerce as described in section 9 and is in violation of 18 USC § 1962(b), and 3) engaged in activities which affect interstate and foreign commerce through a pattern of racketeering activity and collection of unlawful debt in violation of 18 USC § 1962(c).

12. **Describe the alleged injury to business or property.**

See section 3, 3 a) to aa).

13. **Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

The violations of RICO statutes is the direct and proximate cause of the injuries described in 3, 3 a) to aa).

14. **Provide any additional information that you feel would be helpful to the Court in trying the RICO claim.**

a)      Bal's claims against the RICO defendants are not time-barred

See Plaintiffs' Memorandum of Law dated August 11, 2014
at pgs. 5-7

b)      Time-barred RICO predicate offenses are counted

Courts have uniformly held that a cause of action that would be time-barred if it was brought independently may nevertheless serve as a predicate offense for an otherwise timely RICO claim. *Hoxworth v. Blinder Robinson & Co.*, 980 F.2d 912, 924-25, (3d Cir. 1990); *Leroy v. Paytel III Mgmt. Assocs., Inc.,* No. 91 Civ. 1933, 1992 WL 367090 at *4 (S.D.N.Y. Nov. 24, 1992).

c) Bal needs only to be injured by a single predicate offense.

Bal may use predicate offenses targeting other victims to show evidence of a "pattern" of racketeering. Bal needs only to be injured by a single predicate offense committed in furtherance of the scheme. See *Sedima, S.P.R.L.,* 473 U.S. at 488-93; *Deppe v. Tripp*, 863 F.2d 1356, 1366-67 (7th Cir. 1988); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th Cir. 1987); *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1004 (7th Cir. 2004).

d) A civil RICO conspiracy claim properly applies to a conspiracy between a parent corporation and its subsidary, between affiliated corporations, or between a corporation and its own officers and representatives. See *Mauriber v. Shearson/Am. Express, Inc.*, 567 F. Supp. 1231, 1241 (S.D.N.Y. 1983).

e) The pleading requirements of Rule 9(b) apply only to RICO predicate offenses sounding in fraud, and not to the other elements of RICO claims. See *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990).

f) Congress mandated that RICO "shall be liberally construed to effectuate its remedial purposes." See section 904(a) of Pub.L. No. 91-452, 84 Stat. 922, 923, 947. The Supreme Court has repeatedly emphasized that courts are vested with extensive equitable powers to fashion appropriate remedies to redress unlawful conduct. See *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971).

g) Moreover, the Supreme Court has pointedly ruled that where "the public interest is involved . . . those equitable powers assume even broader and more flexible character than when only a private controversy is at stake." See *Porter v. Warner Holding, Co.*, 328 U.S. 395, 398 (1946), *Accord Virginian Ry. Co. v. Sys. Fed'n. No. 40*, 300 U.S. 515, 552 (1937).

Dated: September 9, 2014

                               John Andries Bal, Jr., Agent
                               Plaintiff *pro se*
                               85 Kenmare Street #35
                               New York, New York 10012
                               Telephone: (212) 966-7576
                               MERGENTserv@msn.com