# EXHIBIT 1

SEC Search Results for Itex Corporation

## 137 Documents

SEC Link:

http://www.sec.gov/cgi-bin/txt-srch-sec?text=Itex+Corporation&section=Entire+Website&sort=rank



Home | Previous Page

U.S. Securities and Exchange Commission



See ✱

### Search SEC Website

This search page will not retrieve company filings from our EDGAR database. To find company filings, see **Search EDGAR**.

See also our **Most Common Search Terms** with links to recommended pages and our **Fast Answers — Key Topics** index to information on the SEC website.

| Search words and phrases | Search by section | Sort by rank or date | |
|---|---|---|---|
| Itex Corporation | Entire Website | rank | Search |

(e.g., "*example*") See Search Help
Found **137** documents. **40** are presented, ranked by relevance within section.

**News and Public Statements (see more ...)**

<u>SEC News Digest, 09-28-1999</u>
IJ SEC NEWS DIGEST \ Issue 99-187 September 28, 1999 COMMISSION ANNOUNCEMENTS FEE RATE ADVISORY The fee rate on filings made pursuant to Section 6 (b) of the Securities Act of 1933 may change as of Oc
Size: 82480 Modified: 04/29/2008  /news/digest/1999/dig092899.pdf



<u>SEC News Digest, 02-16-2000</u>
SEC NEWS DIGEST Issue 2000-30 February 16, 2000 ENFORCEMENT PROCEEDINGS SEC SETTLES FRAUD CASE AGAINST ITEX CORPORATION On February 4, the United States District Court for the District of Oregon enter
Size: 35271 Modified: 03/19/2008  /news/digest/2000/dig021600.pdf

<u>Report Pursuant to Section 704 of the Sarbanes-Oxley Act of 2002 Table of Contents I. II. III. IV.</u>

## Regulatory Actions (see more...)

**Comments on s7-37-04**
WILLIAMS & JENSEN, PLLC TELEPHONE (202) 659-8201 SUITE 300 1155 21ST STREET,N.W. FACSIMILE (202) 659-5249 WASHINGTON, D.C. 20036-3308 February 17,2006 Ms. Nancy M. Morris Secretary Securities and Exch
Size: 1112909 Modified: 03/08/2006   /rules/proposed/s73704/williamsjensen021706.pdf

**September 14, 2005 Page 4 Responses to Detailed Questions Posed by the Advisory Committee 1. Has**
Mr. Jonathan G. Katz September 14, 2005 Page 4 Responses to Detailed Questions Posed by the Advisory Committee 1. Has SOX changed the thinking of smaller companies about becoming or remaining a public
Size: 386669 Modified: 10/12/2005   /rules/other/265-23/glasslewis091405.pdf

**September 14,2005 Commitiee Management Officer SEC 100 F Street NE Washington, DC 20549-9303 Re:**
September 14,2005 Mr. Jonathan G. Katz Commitiee Management Officer Securities and Exchange Commission 100 F Street NE Washington, DC 20549-9303 Re: File Number 265-23 Dear Mr. Katz: Glass, Lewis & Co
Size: 396307 Modified: 04/24/2006   /rules/other/265-23/leturner091405.pdf

## Litigation (see more...)

**Litigation Releases: Archives 2000**
Archive of older Litigation Releases available include:
Size: 94658 Modified: 03/11/2009   /litigation/litreleases/litrelarchive/litarchive2000.shtml



**Litigation Release No. 16305 / September 28, 1999**
SECURITIES AND EXCHANGE COMMISSION LITIGATION RELEASE NO. 16305 / SEPTEMBER 28, 1999 ACCOUNTING AND AUDITING ENFORCEMENT RELEASE NO. 1175 SEC V. ITEX CORPORATION, TERRY L. NEAL, MICHAEL T. BAER, GRA
Size: 8997 Modified: 09/29/1999   /litigation/litreleases/lr16305.htm



**Kevin R. Andersen, CPA: Admin. Proc. Rel. No. 34-45502 / March 5, 2002**
ACCOUNTING AND AUDITING ENFORCEMENT Release No. 1510 / March 5, 2002 ADMINISTRATIVE PROCEEDING File No. 3-10714 In the Matter of KEVIN R. ANDERSEN, CPA, : : : : : : : I. The Securities and
Size: 19973 Modified: 03/05/2002   /litigation/admin/34-45502.htm

**Litigation Release No. 16437 / February 15, 2000**
SECURITIES AND EXCHANGE COMMISSION Litigation Release No. 16437 / February 15, 2000 Accounting and Auditing Enforcement Release No. 1229 / February 15, 2000 SEC v. Itex Corporation, Terry L. Neal, Mic
Size: 8684 Modified: 02/18/2000   /litigation/litreleases/lr16437.htm

**SECURITIES EXCHANGE ACT OF 1934 Release No. 42410 / February 10, 2000**
SECURITIES EXCHANGE ACT OF 1934 Release No. 42410 / February 10, 2000 ACCOUNTING AND AUDITING ENFORCEMENT Release No. 1223 / February 10, 2000 ADMINISTRATIVE PROCEEDING File No. 3-10144 JOSEPH M

Litigation Releases: Archives 1999
Archive of older Litigation Releases available include: (Additional materials – the complaint against Benlolo et al. and a questionnaire of investors' experiences – are available for t
Size: 96057 Modified: 03/11/2009   /litigation/litreleases/litrelarchive/litarchive1999.shtml

Litigation Releases - First Quarter 2000
http://www.sec.gov/litigation/litreleases/lit1q00.shtml
Size: 22702 Modified: 02/15/2005   /litigation/litreleases/lit1q00.shtml



LITIGATION RELEASE NO. 16536 \ May 3, 2000
SECURITIES AND EXCHANGE COMMISSION LITIGATION RELEASE NO. 16536 \ May 3, 2000 ACCOUNTING AND AUDITING ENFORCEMENT RELEASE NO. 1256 / May 3, 2000 SEC V. ITEX CORPORATION, TERRY L. NEAL, MICHAEL T. BA
Size: 6033 Modified: 05/05/2000   /litigation/litreleases/lr16536.htm

Litigation Releases - Third Quarter 1999
http://www.sec.gov/litigation/litreleases/lit3q99.shtml
Size: 24486 Modified: 02/15/2005   /litigation/litreleases/lit3q99.shtml

Rel No. 34-42753, AAER 1255 (Cynthia Pfaltzgraff)
SECURITIES EXCHANGE ACT OF 1934 Release No. 42753 / May 3, 2000 ACCOUNTING AND AUDITING ENFORCEMENT Release No. 1255 / May 3, 2000 ADMINISTRATIVE PROCEEDING File No. 3-10198 In the Matter of CYN
Size: 9740 Modified: 11/01/2000   /litigation/admin/34-42753.htm

LITIGATION RELEASE NO. 16430 / February 10, 2000
SECURITIES AND EXCHANGE COMMISSION LITIGATION RELEASE NO. 16430 / February 10, 2000 ACCOUNTING AND AUDITING ENFORCEMENT RELEASE NO. 1224 / February 10, 2000 SEC V. ITEX CORPORATION, TERRY L. NEAL, M
Size: 6458 Modified: 02/11/2000   /litigation/litreleases/lr16430.htm

Litigation Releases - Fourth Quarter 2000
http://www.sec.gov/litigation/litreleases/lit4q00.shtml
Size: 22798 Modified: 02/15/2005   /litigation/litreleases/lit4q00.shtml

Litigation Releases - Third Quarter 2000
http://www.sec.gov/litigation/litreleases/lit3q00.shtml
Size: 25390 Modified: 02/15/2005   /litigation/litreleases/lit3q00.shtml

Corporation Finance (see more...)

completelist98.txt
Company Name CIK # SIC Code A/D Office 1211 FINANCE CORP 859743 6500 Real Estate & Business Services 1626 NEW YORK ASSOCIATES LT
Size: 1047117 Modified: 02/05/2001   /divisions/corpfin/organization/cf1998/completelist98.txt

SEC News Digest, July 23, 2001
SEC NEWS DIGEST July Issue 23 2001 2001-141 ENFORCEMENT PROCEEDINGS APPOINTING DISTRIBUTION ORDER APPROVING PLAN OF DISGORGEMENT FUND OF DISGORGEMENT ADMINISTRATOR AND DIRECTING DISTRIBUTION CORP AND
Size: 27499 Modified: 03/17/2008 /news/digest/2001/dig072301.pdf

## Litigation (see more ...)



LITIGATION RELEASE NO. 16841 / December 26, 2000
SECURITIES AND EXCHANGE COMMISSION Washington, DC LITIGATION RELEASE NO. 16841 / December 26, 2000 ACCOUNTING AND AUDITING ENFORCEMENT RELEASE NO. 1357 SEC V. ITEX CORPORATION, TERRY L. NEAL, MIC
Size: 6538 Modified: 12/27/2000 /litigation/litreleases/lr16841.htm

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA (Tampa Division) : SEC :
IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA (Tampa Division) _____ : United States Securities and Exchange Commission : 100 F Stre
Size: 24828 Modified: 01/25/2007 /litigation/complaints/2007/comp19981.pdf

Administrative Proceeding: Kevin R. Andersen, CPA
UNITED STATES OF AMERICA Before the SECURITIES AND EXCHANGE COMMISSION SECURITIES EXCHANGE ACT OF 1934 Release No. 57709 / April 24, 2008 ACCOUNTING AND AUDITING ENFORCEMENT Release No. 2813 / April 2
Size: 6221 Modified: 12/14/2009 /litigation/admin/2008/34-57709.pdf



LITIGATION RELEASE NO. 16708 / September 18, 2000
SECURITIES AND EXCHANGE COMMISSION Washington, DC LITIGATION RELEASE NO. 16708 / September 18, 2000 ACCOUNTING AND AUDITING ENFORCEMENT 1302 / September 18, 2000 SEC V. ITEX CORPORATION, TERRY L.
Size: 5973 Modified: 09/19/2000 /litigation/litreleases/lr16708.htm

Litigation Releases - Second Quarter 2000
http://www.sec.gov/litigation/litreleases/lit2q00.shtml
Size: 24189 Modified: 02/15/2005 /litigation/litreleases/lit2q00.shtml

## Miscellaneous (see more ...)

Table 1 ENFORCEMENT CASES INITIATED BY THE COMMISSION DURING FISCAL YEAR 1999 IN VARIOUS PROGRAM
Table 1 ENFORCEMENT CASES INITIATED BY THE COMMISSION DURING FISCAL YEAR 1999 IN VARIOUS PROGRAM AREAS (Each case initiated has been included in only one category listed below, even though many cases
Size: 58791 Modified: 09/08/2000 /pdf/annrep99/appxa.pdf

# EXHIBIT 2

10-K 1 v324191_10k.htm FORM 10-K

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D. C. 20549

## FORM 10 - K

(Mark One)

☒ Annual report under Section 13 or 15(d) of the Securities Exchange Act of 1934

For the fiscal year ended July 31, 2012.

or

☐ Transition report under Section 13 or 15(d) of the Securities Exchange Act of 1934

For the transition period from _____ to _____

Commission File Number 0-18275

# ITEX CORPORATION
(Name of small business issuer in its charter)

| Nevada | 93-0922994 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

3326 160th Avenue SE, Suite 100, Bellevue, WA 98008-6418
(Address of principal executive offices)

(425) 463-4000
(Issuer's telephone number including area code)

| | |
|---|---|
| Securities registered under Section 12 (b) of the Exchange Act | None |
| Securities registered pursuant to Section 12 (g) of the Exchange Act | Common Stock $0.01 par value |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act    Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act    Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K    Yes ☒ No ☐

NOTE 12 – STOCK-BASED PAYMENTS

In March 2004 the Company adopted the ITEX Corporation 2004 Equity Incentive Plan (the "2004 Plan"). for which 400 shares of common stock were authorized for issuance. The 2004 Plan provides for the grant of incentive and nonqualified stock options, restricted stock, and stock bonuses to the Company's employees, directors, officers or consultants.

In March 2011, the Company issued 197 restricted shares to thirteen of the Company's employees, valued at the grant date stock price of $4.25 per share, with a vesting period of five years from the date of grant. The fair value of these shares as of the grant date was $837. The grant is to be amortized to compensation expense over the respective requisite service period of five years.

In March 2011, the Company issued 190 restricted shares to the Company's CEO, valued at the grant date stock price of $4.25 per share, with a vesting period of eleven and one-half years from the date of grant. The fair value of these shares as of the grant date was $808. The grant first vests 19 shares in October 2013 and then another 19 shares vest annually in October of each subsequent year. The grant is to be amortized to compensation expense over the respective requisite service period of eleven and one-half years.

In March 2011, the Company issued 5 restricted shares to a consultant who is also a Board of Director, valued at the grant date stock price of $4.25 per share, with a vesting period of one year from the date of grant. The fair value of these shares as of the grant date was $21. The grant was amortized to compensation expense over the respective requisite service period of one year.

In February 2011, the Board of Directors of the Company approved an amendment to the 2004 Equity Incentive Plan, as amended and restated (the "Plan"), that increased the number of shares of the Company's common stock that may be delivered pursuant to awards granted under the Plan by an additional 400 shares. At the time, there were no remaining shares available for awards under the Plan.

At July 31, 2012, 343 shares of common stock granted under the 2004 Plan remained unvested. At July 31, 2012, the Company had $1,297 of unrecognized compensation expense, expected to be recognized over a weighted-average period of approximately six years.

16 shares remained available for future grants under the 2004 Plan as of July 31, 2012.

We account for stock-based compensation in accordance with the related guidance. Under the fair value recognition provisions, we estimate stock-based compensation cost at the grant date based on the fair value of the award. We recognize that expense ratably over the requisite service period of the award.

The following table summarizes the components of stock based compensation including warrants issued to a non-employee:

|  | Year ended July 31, | |
|---|---|---|
|  | 2012 | 2011 |
| Employee Compensation | $ 281 | $ 123 |
| Consultant Compensation | 14 | 7 |
| Totals | $ 295 | $ 130 |

On March 30, 2011, the Company sold 151 shares of its common stock for $4.00 per share to nineteen members of the ITEX Broker Network. The aggregate purchase price of $605 is payable by six-year promissory notes with interest accruing at 2.44% per annum, the applicable federal rate in effect as of the closing. The notes are secured by broker commissions. ITEX will be paid each operating cycle by reducing broker commission checks over the term of the note. The Company has recorded these notes receivable as contra-equity in the accompanying financial statements. Until March 30, 2014, the purchased shares may not be sold or transferred and are subject to the terms of a voting agreement, which provides the shares will be voted in accordance with the recommendations of the Board of Directors and an irrevocable proxy be given to the corporate secretary of ITEX. Because there was a contested election at its annual meeting of stockholders held on May 14, 2012, the Company re-assigned voting rights to the brokers for the 2012 election.

On March 11, 2011, the Board of Directors of the Company declared a dividend, payable to stockholders of record on March 25, 2011 of one right (a "Right") per each share of outstanding Common Stock of the Company, par value $0.01 per share ("Common Stock"), to purchase 1/1000th of a share of Series A Junior Participating Preferred Stock, par value $0.01 per share, of the Company (the "Preferred Stock"), at a price of $15.00 per share (such amount, as may be adjusted from time to time as provided in the Rights Agreement described below, the "Purchase Price"). In connection therewith, on March 11, 2011, the Company entered into a Rights Agreement (the "Rights Agreement") with OTR, Inc, as Rights Agent. The Rights will be exercisable upon the earlier of (i) such date the Company learns that a person or group, without Board approval, acquires or obtains the right to acquire beneficial ownership of 15% or more of ITEX's outstanding common stock or a person or group that already beneficially owns 15% or more of the Company's outstanding common stock at the time the Rights Agreement was entered into, without Board approval, acquires any additional shares (other than pursuant to the Company's compensation or benefit plans) (any person or group specified in this sentence, an "Acquiring Person") and (ii) such date a person or group announces an intention to commence or following the commencement of (as designated by the Board) a tender or exchange offer which could result in the beneficial ownership of 15% or more of ITEX's outstanding common stock. The Rights will expire on March 11, 2014, unless earlier redeemed or exchanged by the Company. If a person or group becomes an Acquiring Person, each Rights holder (other than the Acquiring Person) will be entitled to receive, upon exercise of the Right and payment of the Purchase Price, that number of 1/1000ths of a share of Preferred Stock equal to the number of shares of Common Stock which at the time of the applicable triggering transaction would have a market value of twice the Purchase Price. In the event the Company is acquired in a merger or other business combination by an Acquiring Person, or 50% or more of the Company's assets are sold to an Acquiring Person, each Right will entitle its holder (other than an Acquiring Person) to purchase common shares in the surviving entity at 50% of the market price.

On March 9, 2010, the Company announced a $2,000 stock repurchase program, authorized by the Board of Directors. The program authorizes the repurchase of shares in open market purchases or privately negotiated transactions, has no expiration date and may be modified or discontinued by the Board of Directors at any time. In addition to our common stock activity described in Note 12 – Share-Based Payments, as part of our stock repurchase program, we repurchased a total of 17 and 94 shares of ITEX common stock for $68 and $421 in 2012 and 2011, respectively.

The Company has 5,000 shares of preferred stock authorized at $0.01 par value. No shares were issued or outstanding as of July 31, 2012 or 2011.

| Name and Principal Position | Year | Salary | Stock Awards (1) | All Other Compensation (2) | Total |
|---|---|---|---|---|---|
| Steven White, CEO and Interim CFO | 2012 | $ 250,000 | - | $ 31,700 | $ 281,700 |
|  | 2011 | $ 250,000 | $ 807,500 | $ 10,980 | $ 1,068,480 |

(*) Columns in the Summary Compensation Table that were not relevant to the compensation paid to the named executive officer were omitted.

(1) The amount represents the grant date fair value of stock awards, computed in accordance with FASB ASC 718. The value is based on the closing price of the Company's common stock on the date of grant. Stock awards for Mr. White in 2011 reflect a restricted stock grant of 190,000 shares granted on March 30, 2011. The award vests over an 11.5 year period, for a value of $70,217 per year.

(2) The 2011 and 2012 amounts represent dividends paid on unvested restricted stock.

Executive officers are eligible to participate in all of our employee benefit plans, in each case on the same basis as other employees. The Company reimburses executive officers for all reasonable business expenses incurred by the officer in connection with the performance of the officer's duties.

**Narrative to Summary Compensation Table**

We have a 2004 equity incentive plan (the "Plan") which allows for grants of nonqualified and incentive stock options and stock awards to eligible employees, directors, officers or consultants.

On February 14, 2011, the Board of Directors amended the Plan and authorized 400,000 shares to be available for issuance under the Plan. On March 30, 2011, the Company issued 392,000 restricted shares as equity incentive grants to 15 eligible recipients under the Plan, valued at the grant date stock price of $4.25 per share. These shares include 190,000 shares of restricted common stock issued to Mr. White with a grant date fair value of $807,500. Grants to employees have a service-based vesting period of five years from the date of grant, except that Mr. White's shares vest over an 11.5 year period, with 19,000 shares first vesting in October 2013, and thereafter 19,000 shares vesting annually in October of each subsequent year. Mr. White's award is intended as a long-term retention incentive, and, accordingly, should be viewed as compensation over the 11.5-year vesting period and not solely as compensation for 2011.

*Employment and Change-in-Control Agreements*. Our named executive officer is employed at will and does not have an employment agreement. Our Compensation Committee believes that employment agreements generally encourage a short-term rather than long-term focus, provide inappropriate security to the executives and undermine the team spirit of the organization. The terms of our restricted stock awards to the named executive officer provide that each share of restricted stock issued under the Plan will immediately vest in the event that we are acquired by merger or asset sale, or in the event there is a change in control or ownership of ITEX.

72

## SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ITEX CORPORATION**

| | | |
|---|---|---|
| Date: October 23, 2012 | By: | /s/ Steven White |
| | | Steven White, Chief Executive Officer |
| | | Interim Chief Financial Officer |
| | | |
| Date: October 23, 2012 | By: | /s/ Steven White |
| | | Steven White, Principal Accounting Officer |

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities an on the dates indicated.

| | | |
|---|---|---|
| Date: October 23, 2012 | By: | /s/ Steven White |
| | | Steven White, Chairman of the Board |
| | | |
| Date: October 23, 2012 | By: | /s/ John Wade |
| | | John Wade, Director |
| | | |
| Date: October 23, 2012 | By: | /s/ Eric Best |
| | | Eric Best, Director |

80

# EXHIBIT 3

 

## Business Watchdog

## NEWSLETTER

Contact: Rothschild@BusinessWatchdog.info



**Business Watchdog** *is a non-governmental privately funded independent public service consumer advocacy association. Our statements are opinion. In addition to other authorities, we provide information that is of public interest under the doctrines of Free Speech, Fair Report Privilege, Opinion and Fair Comment Privileges, and Qualified Privilege.*

*This website is copyright-free. Information contained herein may be copied and disseminated without restriction.*

### TROUBLE AHEAD FOR ITEX CORPORATION

**Update:**   We received many responses from ITEX Brokers and ITEX members to our Newsletter and emails. They provided us with helpful information.

Thank you.

Recent responses included Itex Brokers being "disgusted" with the New York Broker [John Castoro], reports of price gouging on the products offered through ITEX, other trading accounts being improperly frozen, and that similar unethical practices are occurring in Canada.

One Broker stated there were "a few" good ITEX Brokers around (we think there are more than "a few" good ITEX Brokers). Three Brokers were offended because they claim not to participate in the unethical business practices that we cited in our below report. Four Brokers asked to be removed from our mailing list. One Broker *harshly* criticized us and questioned our motivation.

**Gerry Layo** is a self-proclaimed internationally famous motivational speaker. His ethics should be discouraged. He apparently believes that thefts from clients' financial accounts are acceptable business practices. An Itex member reported John Castoro, an Itex broker, for stealing $56,650 from his trading account. *In support of the theft,* referring to the Itex member, Mr. Layo advised Mr. Castoro to "Be careful .... cockroaches don't die easy."

*Please note:* WE ARE NOT CLAIMING ALL ITEX BROKERS ARE PARTICIPATING IN UNETHICAL BUSINESS PRACTICES.

Our report is centered on the unethical practices of John Castoro, former Vice President of ITEX and current Broker for New York and New Jersey. ITEX appears to be unable or unwilling to control Mr. Castoro's unethical practices.

In the course of our investigation, we discovered there are gaps in ITEX's procedures that were exploited by Mr. Castoro and resulted in an apparent theft of $56,650 from a member's trading account. When the member "blew the whistle" on Mr. Castoro's theft, Mr. Castoro maliciously froze the member's trading account and put him out of business.

This matter was twice reported to Steven White, current CEO of ITEX. Mr. White's apparent unwillingness to take appropriate action demonstrates poor leadership ability and has left ITEX Brokers and members vulnerable to similar abuse.

**INVESTIGATION No. 1724** mod. 4.03.12 (*Please advise us of any inaccuracies. This report may be modified or withdrawn at our discretion as rebuttal or additional information is provided*)

**ITEX Corporation, 3326 160th Avenue SE, Bellevue, WA 98008**

**ITEX Corporation** ("ITEX"), an approximately 22,000 member barter exchange company, has unethical business practices. The United States Securities and Exchange Commission ("SEC") has prosecuted ITEX multiple times for **defrauding stockholders** (SEC LR-16305 and LR-6437), **accounting fraud** (SEC File No. 3-10714), and **its former CEO was arrested by federal authorities** (search "ITEX Corporation" at http://search.sec.gov/secgov/index.jsp#queryResultsTop).

Charges against ITEX and **John Castoro**, former Vice President of ITEX and current ITEX Broker for New York/New Jersey, are also pending in the New York State Supreme Court (New York County, Index No. 601777/07). It is alleged, *inter alia*, that $56,650 of funds under ITEX's control were **embezzled** (aka converted) by Mr. Castoro from the trading account of an ITEX Member ("Member") (name withheld upon request).

The Member twice notified **Steven White**, CEO of ITEX, of the apparent theft by Mr. Castoro and also that Mr. Castoro, without authority, froze the Member's trading account to maliciously put the Member out of business. Mr. White has turned a "blind eye" to Mr. Castoro's theft and maliciousness and has demonstrated poor leadership ability.

In an ill-conceived attempt to conceal Mr. Castoro's theft, **Robert Benson**, current Vice President of ITEX, appears to have submitted a fraudulent accounting statement and an invalid contract to the

Supreme Court. It is not known if Mr. White directed Mr. Benson to submit these documents.

**Cameron A. Myler**, Itex's attorney, knew, or should have known, that Mr. Benson's documents were likely fraudulent and invalid. In addition, despite USPS proof, Ms. Myler claimed that she did not receive mailings sent to her. In other questionable conduct, Ms. Myler "sewer served" the Member and prevented an appellate court review of the documents submitted by Mr. Benson.

Supreme Court **Judge Debra A. James** ordered this matter to be resolved at an arbitration conducted by the American Arbitration Association. During the course of the arbitration, Mr. White improperly sent **Lawrence R. Mills**, the Arbitrator, $1,650 to influence the decision of the arbitration.

In a written statement, Mr. Mills returned the $1,650 to ITEX and cited Mr. White's improper conduct. Subsequently, Mr. Castoro refused to participate in the court-ordered arbitration.

Judge James recently decided to restore this matter to the Supreme Court calendar. As a result, ITEX, Mr. Castoro, and Izzy Garcia (Mr. Castoro's assistant) must answer charges that they acted in concert to embezzle funds from the member's trading account.

### ITEX may be violating the Racketeer Influenced and Corrupt Organizations Act

Under the **Racketeer Influenced and Corrupt Organizations Act** ("RICO"), a person who is a member of an enterprise (such as ITEX) that has committed two specific crimes within a 10-year period can be charged with racketeering. Those found guilty of racketeering can be fined up to $25,000 and sentenced to 20 years in prison per racketeering count. In addition, the racketeer must forfeit all ill-gotten gains and interest in any business gained through a pattern of "racketeering activity." RICO also permits private individuals harmed by the actions of such an enterprise to file a civil suit; if successful, the individual can collect treble damages.

In addition to the SEC prosecutions against ITEX for defrauding stockholders, accounting fraud, and the pending embezzlement charges, Mr. Castoro, encouraged by gaps in ITEX's procedures, seems to have established **"a pattern of 'racketeering activity.'"**

We do not believe that all Brokers and franchisees are participating in the same unethical practices as Mr. Castoro. It is NOT our intention to blemish the reputation of Brokers and franchisees that have ethical business practices and are a valuable part of the business community.

### The Tax Equity and Fiscal Responsibility Act of 1982

The Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"):

"Recognizes barter exchanges on par with banks, credit card companies, and securities brokers as 'third-party record-keepers' of the financial reports of taxpayers. All sales are reported to the Internal Revenue Service, and a 1099-B is issued to each account annually to reflect all trade sales made within that year."

In short, ITEX, ITEX Brokers ("Brokers"), and ITEX franchisees ("franchisees") are held to the same standard as banks and have a fiduciary duty to protect the interests of ITEX members. Financial transactions must be carefully recorded and processed "on par with banks."

A review of ITEX's procedures reveal gaps that permit thefts from members' trading accounts. It appears that ITEX has not provided adequate training to Brokers regarding their fiduciary duties, avoiding conflicts of interest, and the proper processing of financial transactions.

**Conflicts of interest and thefts from members' trading accounts are a concern**

ITEX's lax procedures encourage thefts and conflicts of interest. Mr. Castoro, who has a fiduciary duty and a professional responsibility to protect the interests of ITEX members, *competes with members for goods and services*. This is a glaring conflict of interest. Moreover, Brokers can give themselves a "priority" and prevent members from competing for goods and services.

Other gaps in procedures allow for the sale of non-existent goods and services. Also, when members purchase scrip (vouchers for merchandise) or restaurant gift certificates from sellers, funds have been improperly transferred *into the Broker's account* - not the seller's trading account. Comingling of Brokers' and members' funds is a breach of fiduciary responsibility and is highly unethical.

When scrip or certificates transacted between ITEX members are not used (as in the above $56,650), Brokers such as Mr. Castoro, *without authority,* illegally claim ownership of the members' funds. This is a theft. In our opinion, this violates the RICO Act.

**States may prosecute ITEX for tax evasion**

States require corporations to obtain permission before conducting business in their state. Failure of businesses to obtain permission results in a denial to conduct business, tax penalties, and criminal or civil prosecution.

ITEX received permission from New York State to conduct business as a domestic (New York State) corporation. On December 29, 1999, New York State revoked permission as a result of ITEX's failures to file tax reports and pay the applicable taxes.

ITEX also received permission from New York State to conduct business as a foreign (non-New York State) corporation. On December 26, 2002, New York State, again, revoked permission as a result of ITEX's failures to file tax reports and pay the applicable taxes.

To date, ITEX has neither filed the required tax reports nor paid any applicable taxes, late fees, or penalties.

In defiance of New York State law, ITEX has continued to conduct business in New York State and sends out daily emails that offer goods and services. ITEX also publishes a member directory to promote sales and purchases with, and between, its New York State members. ITEX may also be illegally conducting business in other states.

**You can help fight corporate crime**

Each state has a corporate records department. Its information is available to the public and is usually obtainable online. A search of your state's records for "ITEX Corporation" would be informative and helpful.

If your search reveals that ITEX does not have permission to conduct business in your state, we ask that you contact us or report ITEX to your state's Attorney General (or equivalent law enforcement agency) *and* your state's tax department. Reports may be made anonymously.

**New York State may prosecute John Castoro for tax evasion**

Mr. Castoro is President and CEO of **NYTO Trade Incorporation** ("NYTO") and is the ITEX Broker for New York/New Jersey. According to the New York State Department of State, neither Mr. Castoro nor NYTO have permission to conduct business in New York State. It appears that Mr. Castoro is illegally conducting business and has not filed the required tax reports or paid the applicable taxes for the past seven (7) years.

**Uninvestigated complaints**

Dr. Whistance-Smith (wjws@concordian.com) complains, "I'm currently involved in pursuing ITEX on a fraudulent land deal worth $600K. This is being pursued with the Toronto Fraud Squad and the RCMP Fraud Squad."

Larry Chiang, of United College Marketing Services, complains that over $12,686.63 in trade credits were "lost" and warns businesses to "Beware of entering into the Itex Barter Network and Itex Barter Depot" (http://www.barternewsweekly.com/2010/01/20/merchants-barter-continues-assault-on-itex-1455/).

David complains, "I know that I am not the only person who was ripped off by their [ITEX - Utah] unscrupulous business practices. It's nice to see that Itex corporate finally did something about it. Now if I could just get my $10,000 back" (http://rippedoffbyitex.blogspot.com/).

Ashley warns not to do business with ITEX's Virginia Beach office (http://www.ripoffreport.com/real-estate-services/itex-cas-rodgers/itex-cas-rodgers-itex-repres-dcc46.htm).

Elizabeth Badurina "warns any small business owners not to do business with these [ITEX] people. At best, they're a disorganized bunch with very little customer support, at worst, they're scam artists" (http://www.epinions.com/content_1967300740).

**We ask ITEX to immediately prohibit illegal and unethical business practices**

There are thousands of well-respected businesses participating in the barter exchange industry. They are a valuable part of the business community. Unfortunately, the illegal and unethical business practices of a few "bad apples" can tarnish the image of the entire barter exchange industry.

ITEX has shown it is not a good business neighbor, are unwilling to protect ITEX members, and is harmful to the barter exchange community. We ask ITEX to immediately prohibit illegal and unethical business practices.

We hope ITEX will survive its current situation and rejoin the barter exchange industry as a trustworthy business neighbor.

Dated: April 3, 2012 (mod.)

Suzanne Rothschild
Project Director